**Docket Nos. 24-5212 (L), 24-5751**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

———————————

ZUNUM AERO, INC.,

*Plaintiff, Counter-Defendant and Appellant,*

v.

THE BOEING COMPANY and BOEING HORIZONX VENTURES, LLC,

*Defendants, Counter-Claimants and Appellees.*

———————————

*Appeal from a Decision of the United States District Court for the Western District of Washington,*
*No. 2:21-cv-00896-JLR · Honorable James L. Robart*

## APPELLANT'S OPENING BRIEF

VINCENT LEVY, ESQ.
SCOTT DANNER, ESQ.
JACK L. MILLMAN, ESQ.
BRIAN T. GOLDMAN, ESQ.
CHARLOTTE BAIGENT, ESQ.
HOLWELL SHUSTER & GOLDBERG, LLP
425 Lexington Avenue, 14th Floor
New York, New York 10017
Telephone: (646) 837-5151
vlevy@hsgllp.com
sdanner@hsgllp.com
jmillman@hsgllp.com
bgoldman@hsgllp.com
cbaigent@hsgllp.com

*Attorneys for Appellant,*
*Zunum Aero, Inc.*

 

## DISCLOSURE STATEMENT

Plaintiff-Appellant Zunum Aero, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Date:  December 16, 2024

*/s/ Vincent Levy*
Vincent Levy

*Attorneys for Plaintiff-Appellant Zunum Aero, Inc.*

i

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES ............................................................... iv

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ....................................................4

STATUTORY AUTHORITIES ..........................................................4

ISSUES PRESENTED.........................................................................4

STATEMENT OF THE CASE.............................................................5

    I.    Factual Background.................................................................5

    II.    Procedural History................................................................12

        A.    Pre-Trial .......................................................................12

        B.    Trial ..............................................................................14

        C.    Verdict, Post-Trial, and Appeal .................................16

SUMMARY OF THE ARGUMENT ...................................................18

ARGUMENT .....................................................................................20

    I.    THIS COURT SHOULD REVERSE THE RULE 50 ORDER .........20

        A.    Substantial evidence supports the trade-secret verdict. ............21

            1.    The district court misunderstood Washington law.........21

            2.    The evidence the district court cited was substantial. ....25

            3.    The district court committed multiple Rule 50 errors....31

ii

B.    Substantial evidence supports the jury's IRL verdict. .............37

    1.    There was substantial misuse evidence. .........................38

    2.    There was substantial causation-and-injury evidence....49

C.    Substantial evidence supported the tortious-interference verdict.......................................................................52

    1.    The "prospective expectancy" evidence was substantial. ...................................................................52

    2.    The district court again violated Rule 50. ....................55

II.    THE COURT SHOULD DENY BOEING'S NEW-TRIAL REQUEST .............................................................................57

A.    This Court should decide the new-trial issue *de novo*. .............57

B.    Boeing's new-trial motion was meritless..................................59

    1.    The verdict was not "against the clear weight of the evidence." ...................................................................60

    2.    Boeing is not entitled to a new damages trial.................60

    3.    Boeing's grab-bag of new-trial arguments is meritless..63

III.    THE CASE SHOULD BE REASSIGNED AND REMANDED .......66

CONCLUSION .....................................................................................67

CERTIFICATE OF COMPLIANCE FOR BRIEFS ...............................68

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Acosta v. City and County of San Francisco*,
    83 F.3d 1143 (9th Cir. 1996),
    *abrog'd on other grounds*, 2024 WL 3250380 (9th Cir. July 1, 2024) .. 57, 59

*Agilent Technologies, Inc. v. Kirkland*,
    2010 WL 610725 (Del. Ch. Feb. 18, 2010) ................................................... 49

*Ambrosini v. Labarraque*,
    966 F.2d 1464 (D.C. Cir. 1992) ................................................................ 33

*AtriCure, Inc. v. Jian Meng*,
    842 F. App'x 974 (6th Cir. 2021) ............................................................. 42

*B12 Consulting, LLC v. UST Global, Inc.*,
    2024 WL 885035 (9th Cir. Mar. 1, 2024) ................................................. 49

*Barrett Bus. Servs., Inc. v. Colmenero*,
    2023 WL 8935046 (E.D. Wash. Dec. 27, 2023) .......................................... 25

*Belo Management Services, Inc. v. ClickA Network*,
    343 P.3d 370 (Wash. Ct. App. 2014) ........................................................ 24

*Bianco v. Globus Med., Inc.*,
    2014 WL 5462388 (E.D. Tex. Oct. 27, 2014),
    *aff'd*, 618 F. App'x 1032 (Fed. Cir. 2015) ................................................ 23

*Boeing Co. v. Sierracin Corp.*,
    738 P.2d 665 (Wash. 1987) ........................................................... 21, 22, 37

*Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*,
    53 F.4th 368 (6th Cir. 2022) ............................................................... 23, 37

*City Solutions, Inc. v. Clear Channel Communications*,
    365 F.3d 835 (9th Cir. 2004) ................................................................... 52

*Culver v. Bennett*,
    588 A.2d 1094 (Del. 1991) ...................................................................... 49

iv

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*,
  95 F.3d 1422 (9th Cir. 1996) ...........................................................61

*Doe ex rel. Rudy-Glanzer v. Glanzer*,
  232 F.3d 1258 (9th Cir. 2000) .........................................................65

*DSC Commc'ns Corp. v. Next Level Commc'ns*,
  929 F. Supp. 239 (E.D. Tex. 1996) ..................................................48

*DSPT Intern., Inc. v. Nahum*,
  624 F.3d 1213 (9th Cir. 2010) .................................................. 60-61

*Duk v. MGM Grand Hotel, Inc.*,
  320 F.3d 1052 (9th Cir. 2003) .........................................................60

*eCommerce Indus., Inc. v. MWA Intel., Inc.*,
  2013 WL 5621678 (Del. Ch. Sept. 30, 2013)........................... 49, 50

*Ed Nowogroski Ins., Inc. v. Rucker*,
  971 P.2d 936 (Wash. 1999) ..............................................................22

*Elcon Const., Inc. v. Eastern Washington Univ.*,
  174 Wash. 2d 157 (2012) .................................................................65

*Fontana Prods. Inc. v. Spartech Plastics Corp.*,
  6 Fed. Appx. 591 (9th Cir. 2001) .....................................................61

*Gov't Emps. Ins. Co. v. Dizol*,
  133 F.3d 1220 (9th Cir. 1998) .........................................................59

*Greensun Group, LLC v. City of Bellevue*,
  436 P.3d 397 (Wash. Ct. App. 2019) ...............................................52

*Group14 Techs., Inc. v. Nexeon Ltd.*,
  2023 WL 7183584 (W.D. Wash. Nov. 1, 2023)................................24

*Handgards, Inc. v. Ethicon, Inc.*,
  743 F.2d 1282 (9th Cir. 1984) .........................................................61

*Hangarter v. Provident Life & Accident Ins. Co.*,
  373 F.3d 998 (9th Cir. 2004) ...........................................................32

*Harper v. City of Los Angeles*,
    533 F.3d 1010 (9th Cir. 2008) ........................................................64

*IDX Sys. Corp. v. Epic Sys. Corp.*,
    285 F.3d 581 (7th Cir. 2002) ..........................................................25

*Imax Corp. v. Cinema Techs., Inc.*,
    152 F.3d 1161 (9th Cir. 1998) ........................................................24

*InteliClear, LLC v. ETC Global Holdings, Inc.*,
    978 F.3d 653 (9th Cir. 2020) ..........................................................24

*Jensen v. EXC, Inc.*,
    82 F.4th 835 (9th Cir. 2023) ..........................................................32

*Johnson v. Paradise Valley Unified School Dist.*,
    251 F.3d 1222 (9th Cir. 2001) ........................................................20

*Kerchman v. County of Riverside*,
    723 F.3d 1104 (9th Cir. 2013) ....................2-3, 18, 26, 29, 30, 31, 32, 34, 46

*Kode v. Carlson*,
    596 F.3d 608 (9th Cir. 2010) ..........................................................63

*Landes Const. Co., Inc. v. Royal Bank of Canada*,
    833 F.2d 1365 (9th Cir. 1987) ........................................................60

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*,
    342 F.3d 714 (7th Cir. 2003) ..........................................................36

*Leingang v. Pierce Cnty. Med. Bureau, Inc.*,
    930 P.2d 288 (Wash. 1997) ........................................................52, 65

*Liljeberg v. Health Servs. Acquisition Corp.*,
    486 U.S. 847 (1988).....................................................................66

*Los Angeles Memorial Coliseum Com'n v. National Football League*,
    791 F.2d 1356 (9th Cir. 1986) ........................................................63

*MAI Sys. Corp. v. Peak Comput., Inc.*,
    991 F.2d 511 (9th Cir. 1993) ..........................................................25

vi

*Mays v. Springborn,*
575 F.3d 643 (7th Cir. 2009) .......................................................... 57

*McGhee v. Arabian Am. Oil Co.,*
871 F.2d 1412 (9th Cir. 1989) ........................................................ 38

*Mighty Enters., Inc. v. She Hong Industrial Co. Ltd.,*
745 Fed. Appx. 706 (9th Cir. 2018) .............................................. 66

*Modumetal, Inc. v. Xtalic Corp.,*
425 P.3d 871 (Wash. Ct. App. 2018) ......................... 13, 36, 38, 47

*Molski v. M.J. Cable, Inc.,*
481 F.3d 724 (9th Cir. 2007) ........................................................ 60

*Palin v. New York Times Co.,*
113 F.4th 245 (2d Cir. 2024) .................................................... 3, 48

*Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.,*
35 F.3d 1226 (8th Cir. 1994) ........................................................ 38

*Pleas v. City of Seattle,*
112 Wash. 2d 794 (1989) .............................................................. 65

*Preston v. U.S.,*
923 F.2d 731 (9th Cir. 1991) ........................................................ 66

*Primiano v. Cook,*
598 F.3d 558 (9th Cir. 2010) ........................................................ 34

*Reese v. Cnty. of Sacramento,*
888 F.3d 1030 (9th Cir. 2018) ...................................................... 20

*Reeves v. Sanderson Plumbing Prods., Inc.,*
530 U.S. 133 (2000)................................... 3, 4, 18, 19, 20-21, 41, 55

*Rent Info. Tech., Inc. v. Home Depot U.S.A., Inc.,*
268 F. App'x 555 (9th Cir. 2008).................................................. 37

*Robbins, Geller, Rudman & Dowd, LLP v. State,*
328 P.3d 905 (Wash. Ct. App. 2014) ...................................... 22, 34

*Scymanski v. Dufault*,
  80 Wash.2d 77 (Wash. 1971) .........................................................................55

*Sea Robin Pipeline Co. v. Fed. Energy Regul. Comm'n*,
  795 F.2d 182 (D.C. Cir. 1986).....................................................................32

*Settlegoode v. Portland Pub. Sch.*,
  371 F.3d 503 (9th Cir. 2004) .......................................................................63

*Solutec Corp., Inc. v. Agnew*,
  1997 WL 794496 (Wash. Ct. App. Dec. 30, 1997).....................................36

*Symbol Techs., Inc. v. Opticon, Inc.*,
  935 F.2d 1569 (Fed. Cir. 1991) ...................................................................32

*Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*,
  68 F.4th 792 (2d Cir. 2023) .............................................. 23, 29, 30, 35

*Tortu v. Las Vegas Metropolitan Police Dep't*,
  556 F.3d 1075 (9th Cir. 2009) ............................................................ 59, 60

*TQ Delta, LLC v. Cisco Sys., Inc.*,
  942 F.3d 1352 (Fed. Cir. 2019) ...................................................................32

*U.S. v. Mendoza*,
  12 F.3d 1109 (Table), 1993 WL 501532 (9th Cir. Dec. 6, 1993) .......... 25, 33

*Union Oil Co. of California v. Terrible Herbst, Inc.*,
  331 F.3d 735 (9th Cir. 2003) .......................................................................62

*United States v. Cooley*,
  1 F.3d 985 (10th Cir. 1993) .........................................................................66

*United States v. Protho*,
  41 F.4th 812 (7th Cir. 2022) .......................................................................32

*United States v. Various Slot Machines on Guam*,
  658 F.2d 697 (9th Cir. 1981) .......................................................................33

*Vollrath Co. v. Sammi Corp.*,
  9 F.3d 1455 (9th Cir. 1993) .........................................................................58

*Wall v. Olympic Vista Development*,
    2004 WL 1557311 (Wash. Ct. App. Mar. 2, 2004)......................................55

*Wallace v. City of San Diego*,
    479 F.3d 616 (9th Cir. 2007) .............................................. 3, 19, 20, 21, 58, 60

*Wellogix, Inc. v. Accenture, L.L.P.*,
    716 F.3d 867 (5th Cir. 2013) .................................................. 38, 42, 50, 51, 52

*Williams v. Gaye*,
    895 F.3d 1106 (9th Cir. 2018) ........................................................................63

*Williams v. Woodford*,
    384 F.3d 567 (9th Cir. 2004) ..........................................................................58

*Winarto v. Toshiba Am. Elecs. Components, Inc.*,
    274 F.3d 1276 (9th Cir. 2001) ........................................................................44

*WorkplaceTechs. Rsch., Inc. v. Project Mgmt. Inst., Inc.*,
    664 F. Supp. 3d 1142 (S.D. Cal. 2023) ..........................................................25

*Zhang v. American Gem Seafoods, Inc.*,
    339 F.3d 1020 (9th Cir. 2003) ........................................................................64

**Statutes**

28 U.S.C. § 1291 ....................................................................................................4

28 U.S.C. § 1331 ....................................................................................................4

28 U.S.C. § 1338 ....................................................................................................4

28 U.S.C. § 1367 ....................................................................................................4

28 U.S.C. § 1454 ..................................................................................................11

Cal. Code Civ. Proc. § 2019.210 ........................................................................25

Wash. Rev. Code § 19.108.010...........................................................................21

**Other Authorities**

Jack Newsham, *A judge who overturned a $72 million verdict against Boeing disclosed he bought and sold Boeing stock while hearing the case — but says his wife's IRA was to blame*, Business Insider (Aug. 21, 2024, 12:55 PM EDT) https://bit.ly/3YfOgMP ................................................................17

James Pooley *et al.*, *Trade Secrets*, § 11.02(2)(c) (2024)................................. 22, 23

Peter S. Menell *et al.*, *Trade Secret Case Management Judicial Guide*, § 4.1 (2023) ...................................................................................................... 24, 47

**Rules**

Fed. R. Civ. P. 50 ............................................................................ *passim*

Fed. R. Evid. 705 ......................................................... 18, 26, 31, 32, 33

## INTRODUCTION

This is an appeal from post-trial rulings undoing a unanimous nine-juror verdict rendered after an eight-day trial. That verdict should be reinstated.

Zunum, an aerospace start-up, sued Boeing for misusing confidential information Zunum shared about its technology and know-how regarding hybrid-electric aircraft; Zunum claimed trade-secret misappropriation, breach of contract, and tortious interference. The district court determined a jury should decide the merits, holding on summary judgment that Zunum's "experts' analyses … suffic[ed] to create a genuine dispute of material fact as to whether the Alleged Trade Secrets were readily ascertainable." Further, the court held that "reasonable jur[ors] could find that Boeing misappropriated each of the Alleged Trade Secrets," used Zunum's information in breach of two agreements, and "interfered with [Zunum's] business expectancies" with two potential partners and investors, "Safran and UTAS."

The court also rebuffed Boeing's pretrial effort to exclude Zunum's experts under *Daubert*. It specifically rejected arguments challenging the experts' methodologies and asserting that their opinions were "conclusory." And it allowed Zunum's three technical experts to testify that Zunum's trade-secret information was novel, valuable, and not readily ascertainable.

1

At trial, seventeen witnesses testified, including five Zunum experts. The jury received over 200 exhibits documenting how Boeing, impressed by Zunum's technical progress, invested in Zunum for "low-cost R&D," and then launched copycat programs based on Zunum's confidences, pitched Zunum's technology to an aerospace multinational, the Safran Group, and ultimately used its "leverage" to thwart Safran's investment in Zunum—a critical capital injection for the start-up.

The jury deliberated for two days and returned a careful, split verdict, finding Boeing willfully and maliciously misappropriated 11 of Zunum's 19 trade secrets, breached one agreement (out of two), and tortiously interfered with Zunum's business expectancy with Safran. The jury awarded Zunum approximately $80 million—less than half what Zunum sought.

Yet, after all that, the district court undid the jury's hard work. The court's decision granting Boeing judgment notwithstanding the verdict, however, violated clear limits on its role. For example, the court skirted its summary-judgment assessment of the adequacy of Zunum's experts' opinions by branding their trial testimony "conclusory"—but the testimony was not conclusory, and regardless that would not have been a reason to disregard it. As this Court instructed, "[h]aving admitted the testimony of [a non-movant's] experts, [a] judge [i]s bound to take their testimony as true for the purposes of considering whether to grant judgment as a matter of law." *Kerchman v. County of Riverside*, 723 F.3d 1104, 1110-11

2

(9th Cir. 2013) (reversing JMOL). And this was not the court's only error. It improperly discarded fact-witness testimony as incredible, stretched documents to interpret them *against* Zunum, and ignored significant other evidence favorable to Zunum. The court took these actions again and again, despite them being clearly prohibited under *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000).

The court then doubled down on these Rule 50 errors by granting Boeing's conditional new-trial motion filed after Zunum appealed, one day after the judge disclosed that he traded Boeing stock during the case. But the court lacked jurisdiction to grant relief given Zunum's intervening appeal; the court's reliance on the flawed Rule 50 order was error, *Wallace v. City of San Diego*, 479 F.3d 616, 630 (9th Cir. 2007); and Boeing cited no other viable basis to retry the case.

A court cannot permit a case to proceed to trial, only to substitute its view of the evidence for the jury's post-verdict. "The jury is sacrosanct in our legal system, and [courts] have a duty to protect its constitutional role," including "by ensuring that the jury's role is not usurped by judges." *Palin v. New York Times Co.*, 113 F.4th 245, 255 (2d Cir. 2024). This Court should reverse.

# JURISDICTIONAL STATEMENT

The district court's jurisdiction rested on 28 U.S.C. §§ 1331 and 1338(a) as to Boeing's patent-inventorship counterclaim and § 1367(a) otherwise.

This Court has jurisdiction under 28 U.S.C. § 1291. On August 14, 2024, the district court granted Boeing's Rule 50(b) motion following a jury verdict, and on August 19 entered an amended final judgment. 1-ER-6-8. On August 22, Zunum timely appealed, 18-ER-4124, initiating Case No. 24-5212. On September 5, Boeing requested a conditional new-trial ruling under Rule 50(c). 2-ER-64. On September 17, the court granted relief and amended the judgment. 1-ER-2-4. Zunum timely appealed on September 17, 18-ER-4122, initiating Case No. 24-5751. The two appeals were consolidated.

# STATUTORY AUTHORITIES

Relevant authorities appear in the Addendum.

# ISSUES PRESENTED

I. Whether judgment under Rule 50 may be entered consistent with *Reeves*.

II. Whether the district court's new-trial ruling can stand.

III. Whether the case should be reassigned on remand.

4

## STATEMENT OF THE CASE

### I.  FACTUAL BACKGROUND

**A.**  Founded in 2013, Zunum was a first-mover in "the next major innovation" in aviation:  hybrid-electric planes.  11-ER-2478:8-2479:12.  Industry leaders, including Boeing, projected hybrid-electric planes would not enter the market before the 2030s or be competitive with conventional airliners.  11-ER-2479:5-2480:3; 16-ER-3636:7-21.  But Zunum's founders—Matt Knapp, an M.I.T.-trained aerospace engineer, and Ashish Kumar, a Cornell-trained mechanical engineer—realized they were wrong.  11-ER-2480:4-23; 11-ER-2475:11-15; 14-ER-3353:7-11.

From 2013 through 2016, Zunum performed foundational work developing its trade secrets.  11-ER-2483:5-2484:3; 11-ER-2501:18-2502:1.  Zunum discovered that, for reasons including rapid advancements in battery technology, hybrid-electric planes flying 10 passengers over regional ranges—trips too expensive to fly on larger planes—could be price-competitive and marketable by the early 2020s.  11-ER-2480:4-23; 11-ER-2483:5-2484:3; 11-ER-2498:10-23.

**B.**  Starting in August 2016, Zunum began sharing details of its trade secrets with Boeing under a proprietary information agreement (the "PIA") for a potential investment.  3-ER-607; 11-ER-2526:12-2528:22; 11-ER-2529:19-22.  For months, Boeing received hundreds of pages of confidential documents, held meetings and

5

calls, obtained technical data, and had leading Boeing experts evaluate Zunum's data. 11-ER-2529:23-2533:14. Boeing's experts then reported they "evaluated the [Z]unum claims," "validated [Zunum] ha[d] excellent analysis capability (better than us in this particular area)," and "identified that they are looking at a propulsion architecture we currently are not[.]" 4-ER-728.

In March 2017, Boeing invested $5 million. 11-ER-2533:25-2534:8. Thereafter, Boeing had limited contractual rights to Zunum's confidential information, including a board observer. 11-ER-2534:16-2535:24; 6-ER-1213. Boeing's rights were constrained by a 2017 investor-rights letter (the "IRL") because its investment was more akin to "a loan" than a partnership. 15-ER-3384:22-3385:8. Thus, it had *no* right to use Zunum's confidences "for any purpose (other than to manage [Boeing's] investment in [Zunum])." 6-ER-1214.

**C.** With funding, Zunum "had the chance to run hard" and ramp up its trade-secret R&D, hiring 47 full-time employees. 11-ER-2536:16-25; 11-ER-2601:9-10. *First*, Zunum developed "**Aircraft Trade Secrets**" (Nos. 1-6 and 20) relating to Zunum's ZA-10 hybrid-electric plane. Most programs use "designs from the past," but Zunum's product required "develop[ment] from the bottom up." 11-ER-2518:7-2519:18. Thus, the Aircraft Trade Secrets "design[ed] an airplane from the ground up[] to meet certain business and market requirements." 14-ER-3156:7-13; 14-ER-3157:11-13. They spanned initial-design requirements

6

and objectives to final specifications. 14-ER-3173:12-14; 14-ER-3177:11-3178:8. Zunum also created a "compilation of important data for key components," and a "roadmap for batteries and alternate energy sources." 14-ER-3174:6-20.

*Second*, Zunum developed "**Powertrain Trade Secrets**" (Nos. 7-13). The powertrain is "what delivers the power to move a vehicle." 14-ER-3279:19-3280:5. Zunum's Powertrain Trade Secrets include "[a] megawatt class, hybrid-electric powertrain, and several components that make that and some methodology and plans [for] how to develop it." 14-ER-3279:3-9; 14-ER-3297:15-18. Again, Zunum designed it from scratch—as Knapp explained, a "hybrid powertrain was novel," "[s]o the variables [Zunum was] looking at were unusual," as was "the trade space." 11-ER-2515:1-3. By July 2017, Zunum had progressed from "initial concepts and words on a page[] to actual hardware," "low and medium power testing," and "first prototypes." 11-ER-2544:10-19; 4-ER-828-36.

*Third*, Zunum developed "**Market Trade Secrets**" (Nos. 15-19), which include market research, cost analyses, and business plans for market entry. 16-ER-3663:8-3664:22. By July 2017, Zunum developed a plan for how Zunum was "going to commercialize and take this [hybrid-electric airplane] technology to market." 11-ER-2541:15-2542:8.

Zunum routinely presented its technical and commercial secrets to Boeing, including at confidential board meetings, *e.g.*, 11-ER-2538:23-2539:11; 4-ER-828;

7

6-ER-1356, and a technical-workshop meeting with Boeing experts post-investment (December 12, 2017) that "show[ed] [Boeing] how [Zunum] w[as] achieving the aircraft [and] performance [Zunum] announced[.]"  15-ER-3400:13-22; 6-ER-1225.

**D.**   Unbeknownst to Zunum, however, Boeing ran a number of hybrid-electric-aircraft R&D programs in parallel, using Zunum confidential information in breach of the IRL.  First, after the investment, Boeing launched a so-called "Thin Haul" program, which it staffed with engineers who previously performed pre-investment diligence using Zunum's proprietary information.  13-ER-2888:10-2890:6; 4-ER-767-71.  Through Thin Haul, Boeing developed its own "configuration for a ten seater hybrid aircraft" to decide "if *Boeing* should go into this market" on its own.  4-ER-818 (emphasis added); *see also* 5-ER-1189 (describing goal as including "provid[ing] directional guidance on Boeing's interest in developing our own Thin Haul aircraft").  Boeing witnesses admitted they felt free to, and did, use Zunum's information for that competitive program.  13-ER-2889:17-2890:6; 13-ER-3092:12-17; 13-ER-3095:10-14;14-ER-3235:23-3236:2.  One executive circulated Zunum's trade-secret bible—describing "the unique aspects of sizing hybrid/electric aircraft" and "the methodology they use."  5-ER-909.  Boeing concealed this copycat program from Zunum—following "a parallel development path."  5-ER-1004; 4-ER-764; 4-ER-818.

8

Second, Boeing also set up an "Electric Lab" (E-Lab) as a follow-on "endeavor" to Thin Haul, aiming "to continue Boeing's research and development initiative around electric propulsion in a lab setting." 14-ER-3330:24-3331:5. Boeing hid that, too. 5-ER-1000 ("do not tell [Zunum's CTO] anything").

Boeing's parallel programs reflected its undisclosed reasons for investing in Zunum. Before the Zunum investment, Boeing reported internally it was "likely behind" Zunum and "maybe Airbus" with respect to "optimization of energy usage for hybrid electric aircraft." 3-ER-612. Boeing's "Deal Thesis" and "Value Drivers" for investing thus included gaining "access to low-cost R&D that complements current internal efforts" and "[e]nsur[ing] IP access to technology developed for application to Boeing products." 4-ER-669; 5-ER-998.

Boeing recognized the competitive risk Zunum posed. Internal documents reported that, if Zunum's "operating economics claims are correct, [Zunum] will disrupt our MAX business[.]" 7-ER-1658; 13-ER-3061:9-3062:16. That is why Boeing wanted "to kickoff a hybrid electric airplane concept from scratch." 4-ER-822. Boeing also wanted to "[i]nvestigate short range regional [] hybrid electric aircraft," "[s]hadow Airbus and [Z]unum," and "[u]nderstand possible danger to 737." 7-ER-1652. By January 2018, Boeing included Zunum's hybrid-electric aircraft in a competitive assessment deck with "intelligence" on Airbus and

9

Zunum, again improperly using confidences Zunum provided at the December 2017 workshop. 6-ER-1234; *see also* 14-ER-3238:4-6; 14-ER-3242:2-21.

In addition to the parallel programs and competitive analysis, Boeing also presented its work using Zunum's "designs, market perspectives, and technology forecasts" to the market to further its own programs. 6-ER-1228. By December 2017, Zunum had developed a relationship with Safran and explored potential partnerships and financing. 15-ER-3408:23-25. Unbeknownst to Zunum, however, Boeing's E-Lab (which used Zunum confidences) proposed its *own* partnership with Safran on hybrid-electric technologies and an engine similar to Zunum's. 6-ER-1209; 6-ER-1344; 6-ER-1437; 14-ER-3328:13-3329:2; 14-ER-3338:9-23. Unsurprisingly, this caused "confusion" at Safran and elsewhere, 6-ER-1228, such that Boeing's technical advisor to Zunum (Fernandes) acknowledged "our (Boeing) words and actions have already set Zunum back from Safran investment perspective," 6-ER-1231. *See also* 15-ER-3405:6-3406:14.

E. By fall 2018, Zunum needed additional funds to continue as a viable entity. 11-ER-2577:23-2579:4. The leading potential funder was Safran, which had sent a letter of intent to invest $5 million. 15-ER-3408:23-25. In October 2018, after lengthy negotiations and exchanges of proposed terms, Safran flew executives from France to Washington to close. 15-ER-3422:2-23. Shockingly, Safran ended negotiations on arrival. 15-ER-3422:24-3423:11.

10

Boeing documents indicate Boeing used its "leverage" to stop the deal. 6-ER-1346 (Boeing executive: "[w]hat leverage to do we have on the Safran deal," and "if we don't like it let's use the leverage"); 6-ER-1353 (Boeing executive: Sa[]fran is "unlikely to close round due to concerns that its investment would be seen as a negative to Boeing"); 6-ER-1437 (Boeing executive: "Sa[]fran was interested but chose not to invest after we elected not to participate and not to endorse Zunum."). At the time, Boeing noted that if Zunum went "bankrupt," it would get "first dibs on [Zunum's] IP and assets." 6-ER-1346-1347. In November 2018, without funding, Zunum ceased operations. 12-ER-2831:4-9.

Boeing then pursued a Safran initiative without Zunum, including "reconstituting a market play similar to what Zunum was attempting." 6-ER-1437. But Boeing soon "had an[other] idea": incubate a new company to replace Zunum. 15-ER-3594:13-20; 7-ER-1551. That idea became Electra—which "buil[t] on [the] excellent work" from Thin Haul, 6-ER-1443, 6-ER-1449, and which asked Boeing to indemnify it against any lawsuit by Zunum. 7-ER-1567; 6-ER-1441. Today, Electra has *$3 billion* in orders. 16-ER-3732:16-20.

## II.   PROCEDURAL HISTORY

### A.   Pre-Trial

Zunum sued Boeing in November 2020 in Washington state court.  Boeing filed a counterclaim concerning the inventorship of certain patents and removed to federal court under 28 U.S.C. § 1454.  Dkt. 1.

During discovery, Zunum submitted a 120-page document defining its trade secrets.  Dkt. 524.  Both parties instructed their experts to opine whether these definitions reflected valuable secrets.

In February 2024, both parties filed *Daubert* motions, which the court denied in part and granted in part.  The court permitted Zunum's three technical experts to testify that Zunum's trade secrets were not generally known or readily ascertainable.  10-ER-2218-2317.  It rejected Boeing's claim that they provided conclusory opinions.  For example, it held that Zunum's powertrain expert has "technical experience" and "expertise," "[s]o if he sees the words 'motor controller,' in order to know if it's used in a Boeing product, he has to know what it is and he needs to know enough about the technical use of it[.]"  10-ER-2262.

Shortly thereafter, the court denied Boeing's motion for summary judgment on Zunum's trade-secret-misappropriation claim, two breach-of-contract claims (the PIA and IRL), and tortious-interference claims.  9-ER-2186.

In sustaining Zunum's trade-secrets claim, the court held that Zunum sufficiently particularized its trade secrets, including by "adequately identif[ying] its trade secrets." 9-ER-2196. Moreover, Zunum's experts' analyses were "sufficient to create a genuine dispute of material fact as to whether the Alleged Trade Secrets were readily ascertainable." 9-ER-2194. Further, the court held that "a reasonable jury could find that Boeing misappropriated each of the Alleged Trade Secrets," stressing the significance of "circumstantial evidence" as misappropriation "can be notoriously difficult to prove." 9-ER-2198 (citing *Modumetal, Inc. v. Xtalic Corp.*, 425 P.3d 871, 879 (Wash. Ct. App. 2018)).

Relatedly, the court found a genuine fact-dispute about "whether Boeing's alleged use of Zunum's trade secrets was authorized under the parties' agreements." 9-ER-2201. Citing evidence later introduced at trial, it held that, given "evidence that Boeing was developing an 'internal R&D plan' without Zunum's knowledge to maintain Boeing's competitive market position just before the [copycat program] commenced, a reasonable jury could find that one purpose of the [program] was to design a competing aircraft system[.]" 9-ER-2202.

The court also upheld Zunum's tortious-interference claim, citing evidence (later shown to the jury) that Boeing aimed to "block the competitors" and bring Safran into its E-Lab to develop a similar motor/inverter to Zunum's, "while Zunum was simultaneously meeting with Safran." 9-ER-2207-2208. A jury could

13

find, the court held, "that Boeing acted to deprive Zunum of business opportunities with its competitors or to gain a competitive advantage in the marketplace with exclusive access to Zunum's proprietary technology." 9-ER-2209.

In May 2024, the court requested that the parties submit statements of Zunum's trade secret definitions. 9-ER-2184. The court rejected both parties' competing statements, instead "draft[ing] its own definitions" for the jury. 9-ER-2176; *see* 7-ER-1556 ("Trial Ex. 2000").

### B. Trial

During an eight-day trial, the jury heard testimony from 17 witnesses, including Zunum's five experts, and received more than 200 exhibits.

Zunum's co-founders—Knapp and Kumar—testified about Zunum's discovery of a viable market for hybrid-electric planes, the development of Zunum's trade secrets through extensive time, effort, and resources, the value that Zunum derived from its trade secrets, and the efforts Zunum took to keep them secret. 11-ER-2473-2609; 12-ER-2635-2844; 14-ER-3352-3359; 15-ER-3382-3557. In addition, Zunum's founders testified about Zunum's relationship with Boeing—from their initial high hopes about Boeing's investment to their devastating discovery of Boeing's copycat programs. *Id.*

Zunum's three technical experts also testified. Zunum's Aircraft Trade Secrets expert had decades of experience, designing five clean-sheet aircraft at

Bombardier Aerospace, then "the third largest aerospace company in the world." 14-ER-3155:15-3156:6. Zunum's Powertrain Trade Secrets expert had been Chief Engineer of United Technologies Aerospace Systems ("UTAS"), where he managed over 800 engineers working on electrical systems for airplanes including Boeing's 787. 14-ER-3276:16-3278:11. And Zunum's Market Trade Secrets expert was an M.I.T.-trained aerospace engineer and airline-management specialist with decades of experience as an airline executive and consultant to American, United, Delta, Southwest, and many others. 16-ER-3659:7-3662:2.

Drawing on their experience and expertise, Zunum's experts testified that each of Zunum's trade secrets was valuable and not generally known or readily ascertainable, and that their technical analyses of documents showed Boeing used Zunum trade secrets for Boeing R&D. 14-ER-3157:11-21; 14-ER-3182:1-5; 14-ER-3279:3-18; 14-ER-3297:15-18; 16-ER-3668:24-3669:11. Zunum's experts presented demonstratives comparing exemplar Zunum technical documents reflecting aspects of its trade secrets with Boeing technical documents incorporating them. *E.g.*, 14-ER-3153:11-14; 14-ER-3174:6-24; 14-ER-3275:13-15; 14-ER-3295:6-23; 16-ER-3657:25-3658:2; 16-ER-3678:11-3679:9.

The jury also heard Boeing executives and engineers admit to using Zunum confidences in Boeing R&D programs. *E.g.*, 13-ER-2889:17-2890:6; 13-ER-3092:12-17; 13-ER-3095:10-25; 14-ER-3235:23-3236:2. One witness admitted he

15

used Zunum's confidences in Boeing presentations without attribution. 13-ER-3080:8-23. Another admitted he staffed Boeing's Electric Lab team with engineers from Boeing's copycat program and proposed partnering with Safran on similar (if not identical) hybrid-electric technologies. 14-ER-3328:13-3329:2; 14-ER-3334:24-3338. Boeing witnesses were also confronted with documents showing they intentionally interfered with Zunum's expected investment from Safran. 6-ER-1346; 6-ER-1353; 6-ER-1437; 15-ER-3586:5-3592:22.

Kumar testified to the "disastrous" consequences of Safran not investing, causing Zunum to furlough roughly 100 employees and cease operations. 15-ER-3434:19-3436:7.

### C. Verdict, Post-Trial, and Appeal

The jury deliberated for two days and issued a split verdict, finding Boeing misappropriated 11 of 19 trade secrets, breached the IRL (but not the PIA), and tortiously interfered with Safran (but not UTAS). 9-ER-2131. The jury awarded Zunum about $80 million—less than half what Zunum sought. 9-ER-2131.

Boeing moved for judgment under Rule 50(b), or, alternatively, a new trial under Rule 59. 9-ER-2057. The court granted Boeing's Rule 50(b) motion. 1-ER-7. On trade secrets, it completely dismissed Zunum's experts' testimony as "conclusory," and found the remaining evidence inadequate to define *any* of the 11 trade secrets with "sufficient particularity" or show they had value from not being

16

generally known or readily ascertainable.  1-ER-16-41.  On the IRL, the court

acknowledged Zunum shared protected confidences, but dismissed Zunum's

evidence of misuse on *four* Boeing programs.  1-ER-41-55.  Finally, on tortious

interference, the court determined there was inadequate evidence of a business

expectancy with Safran, dismissing Zunum testimony as "hubris."  1-ER-58.

On August 22, Zunum appealed.  18-ER-4124.  Two weeks later, Boeing

moved in district court for a conditional new-trial ruling.  2-ER-64.

On September 16, the district court *sua sponte* issued a "Notice of Financial

Transaction."  2-ER-61.  For the first time, Judge Robart informed the parties that

WTB, a broker managing his wife's retirement accounts, purchased 26 Boeing

shares in April 2023.  2-ER-62.  In May 2023, "Judge Robart directed WTB to sell

the Boeing shares."  *Id*.  Days later, WTB purchased 32 more shares.  *Id*.  In June

2023, "Judge Robart again directed WTB to sell" these.  *Id*.[1]

On September 17, before Zunum's deadline to oppose Boeing's new-trial

motion (September 20), the district court entered an order wrongly stating it was

"not oppose[d]," and conditionally granted it "for the reasons discussed in the

---

[1] This disclosure came approximately three weeks after the media disclosed an
interview with Judge Robart on these trades.  https://bit.ly/3YfOgMP.

court's August 14, 2024 order and Boeing's motion for judgment as a matter of law or, in the alternative, for a new trial." 1-ER-4-5.

## SUMMARY OF THE ARGUMENT

**I.** Under Rule 50, courts "must draw all reasonable inferences in favor of the nonmoving party," must "disregard all evidence favorable to the moving party that the jury is not required to believe," must "give credence to the evidence favoring the nonmovant," and "may not make credibility determinations or weigh the evidence." *Reeves*, 530 U.S. at 150-51. The district court violated all these prescriptions.

**I.A.** On trade secrets, the court disregarded the testimony of Zunum's three technical experts, all of whom survived *Daubert*, declaring it too "conclusory." But "[h]aving admitted the testimony of [Zunum's] experts, the judge was bound to take their testimony as true for the purposes of considering whether to grant judgment as a matter of law." *Kerchman*, 723 F.3d at 1110-11. This is true even if Zunum's experts gave only conclusory testimony, which Federal Rule of Evidence 705 permits, but here the experts explained why they reached their conclusions. The court also wrongly ignored other pro-Zunum evidence, such as the founders' testimony and evidence (deemed 'key' at summary judgment) of Zunum's substantial investments to develop its secrets.

18

**I.B.** The court made similar errors regarding breach of the IRL. It acknowledged Zunum shared protected confidences, but failed to "draw all reasonable inferences in favor of the nonmoving party," *Reeves*, 530 U.S. at 150. For example, it disregarded a slide deck showing Boeing used Zunum confidences for an improper purpose—a competitive assessment—because the cover was dated January 8, 2017, before the IRL. But overwhelming evidence showed the date was a typo—the deck was from January 8, 2018 (after the IRL). The court improperly reweighed this and the other evidence, often drawing inferences *against* Zunum.

**I.C.** Errors also plague the court's tortious-interference analysis. The court acknowledged a founder's testimony supported Zunum, but dismissed it as "hubris." That is a classic credibility determination for the jury. And there was substantial evidence corroborating that testimony, which the court ignored, including (i) documents where Boeing discussed using "leverage" to stop a deal Boeing viewed as "too Safran friendly" and (ii) documents showing the deal fell apart because of Boeing's actions—not Zunum's "hubris."

**II.A** This Court should deny Boeing a new trial. First, the Court should exercise *de novo* review, because Boeing requested a new trial only *after* Zunum appealed, meaning the district court lacked jurisdiction. The district court also relied generically on its Rule 50 ruling, but it cannot support a new trial. *Wallace*, 479 F.3d at 630.

19

**II.B.** Regardless, under any standard of review, Boeing's new-trial request fails. Boeing does not identify evidence that could show the verdict was "against the clear weight of the evidence." *Id.* The damages award was not grossly excessive, many of Boeing's other arguments were waived at trial, and its other objections lack merit.

**III.** This Court should reassign the case on remand given the district court's failure to disclose its stock trades contemporaneously and other unusual actions.

## ARGUMENT

## I. THIS COURT SHOULD REVERSE THE RULE 50 ORDER

This Court "review[s] the district court's grant of judgment as a matter of law *de novo*." *Wallace*, 479 F.3d at 624. In so doing, this Court "gives significant deference to the *jury's verdict* and to *the nonmoving parties* when deciding whether that decision was correct." *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1036 (9th Cir. 2018) (cleaned up and emphasis added).

"A jury's verdict must be upheld if it is supported by substantial evidence"—that is, evidence "adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." *Johnson v. Paradise Valley Unified School Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001). "The court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves*,

530 U.S. at 150.  It must "disregard all evidence favorable to the moving party that the jury is not required to believe" and "give credence to the evidence favoring the nonmovant."  *Id.* at 151.  "Judgment as a matter of law may be granted only where, so viewed, the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict."  *Wallace*, 479 F.3d at 624.  That is not so here.

### A.  Substantial evidence supports the trade-secret verdict.

Contrary to the court below, substantial evidence permitted a jury to "identify" the "trade secrets with sufficient particularity" and find they "derived value from not being generally known to or readily ascertainable by others."  1-ER-17.

### 1.  The district court misunderstood Washington law.

**a.**  Washington, like most states, adopted the Uniform Trade Secrets Act. Washington's statute ("WUTSA") defines a trade secret, in relevant part, as "information, including a formula, pattern, compilation, program, device, method, technique, or process" that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use."  RCW 19.108.010(4).  WUTSA thus requires "some novelty." *Boeing Co. v. Sierracin Corp.*, 738 P.2d 665, 674 & n.2 (Wash. 1987) (en banc).

Because trade secrets "are by their nature often difficult to describe," they engender "a flexible identification requirement," James Pooley *et al.*, *Trade Secrets*, § 11.02(2)(c) (2024); a factfinder may thus find trade secrets exist based on circumstantial evidence such as "the effort and expense that was expended in developing the information" and/or the difficulty of replication. *Robbins, Geller, Rudman & Dowd, LLP v. State*, 328 P.3d 905, 911 (Wash. Ct. App. 2014). The question is whether a combination of information meets the statutory test, "since trade secrets frequently contain elements that by themselves may be in the public domain but together qualify as trade secrets." *Boeing*, 738 P.2d at 675.

**b.** Although the jury instructions parroted WUTSA's trade-secret definition, the district court misapplied Washington law post-trial by requiring substantive proof not just of statutory novelty, but also of "sufficient particularity." 1-ER-18. To be clear, Zunum adequately specified its secrets at trial (*infra*, 25-37), but the court's post-trial super-imposition of a particularity requirement was wrong.

To our knowledge, no Washington court has imposed a substantive particularity requirement, and Washington's Supreme Court has made clear that the existence of a trade secret is a jury question, while rejecting judicial efforts to "add[] an element to the Uniform Trade Secret Act's definition of a trade secret." *Ed Nowogroski Ins. v. Rucker*, 971 P.2d 936, 941, 947 (Wash. 1999) (en banc).

22

Meanwhile, although other courts applying the Uniform Act require proof of a valuable secret, they do not add an extra-statutory element requiring full disclosure of the trade secret or its particularization at trial.  Indeed, "plaintiff[s] may prevail in a trade-secrets case without identifying a specific item of information that is not publicly known or readily accessible." *Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 380 (6th Cir. 2022) (UTSA); *see also Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 803 (2d Cir. 2023) (permitting expert's discussion of one "representative example to demonstrate that all 97 manuals and guides comprise commercially valuable information that [party] keeps confidential" in UTSA case).

Similarly, a leading treatise explains that "[i]t is not necessary to describe all trade secrets as though they were patent claims."  Pooley, *supra*, § 11.02[2][c]. The reason is plain: "The nature of the patent right, which is exclusionary and basically in contradiction of free market principles, must be extremely precise," but "[t]rade secret rights … are nonexclusive[.]"  *Id.*; *see also Bianco v. Globus Med., Inc.*, 2014 WL 5462388, at *7 (E.D. Tex. Oct. 27, 2014), *aff'd*, 618 F. App'x 1032 (Fed. Cir. 2015) (rejecting argument party failed to "disclose[] all of the features that comprised his trade secret" as "conflat[ing] trade secret law and patent law principles").  The tort is for misappropriation of a valuable secret, not violating a sanctioned monopoly on a defined and published invention.

23

To the extent courts applying WUTSA require particularization, they do so as "a procedural notice issue" in discovery, invoking authority under the Federal Rules; it is a "drafting step to provide clarity so that merits issues can separately and later be determined in a facilitated manner." *Group14 Techs., Inc. v. Nexeon Ltd.*, 2023 WL 7183584, at *10 (W.D. Wash. Nov. 1, 2023). But, "the need for identification should not be weaponized or otherwise used to deny justice to the trade secret plaintiff." Peter S. Menell *et al.*, *Trade Secret Case Management Judicial Guide*, § 4.1 (2023). And, "[o]nce a case reaches the merits phase, the question is no longer whether the identification is adequate, but whether the trade secret as identified meets the statutory or common law definitions for a trade secret." *Id*. § 4.8. Thus, only WUTSA's elements need be established to the jury.

The cases cited by the district court do not say otherwise. For instance, *Belo Management Services, Inc. v. ClickA Network* concerns the need to provide "specific, concrete examples" satisfying "the requirements for a trade secret," such as novelty, under Washington's Public Records Act. 343 P.3d 370, 375 (Wash. Ct. App. 2014). The other cases, all federal, are similarly inapposite. *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 655, 658-60 (9th Cir. 2020) and *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1166 (9th Cir. 1998), applied California law, which expressly requires specificity as a matter of notice "before

commencing discovery" (CCP § 2019.210), and both cases concern mandatory

pre-trial disclosures, rather than post-trial review.[2]

### 2. The evidence the district court cited was substantial.

The evidence discussed by the district court satisfied WUTSA's statutory

elements—and even the erroneously superimposed particularity requirement.

The testimony of Zunum's three technical experts, spanning 168 transcript

pages, sufficed. *U.S. v. Mendoza*, 12 F.3d 1109 (Table), 1993 WL 501532 at *1

(9th Cir. Dec. 6, 1993) ("expert testimony concerning an ultimate issue"

admissible). They testified at length that each secret was "novel, valuable, [and]

kept secret," describing their methodology, giving examples, and discussing record

material. 1-ER-18-40. And they also described the trade secrets, 1-ER-18-40,

consistent with the definitions the court devised and provided the jury after

rejecting Zunum's, *supra* at 14.

Post-trial, the court was required to accept this expert evidence, which

earlier satisfied Zunum's burden on summary judgment, as true under Rule 50:

---

[2] *See also MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 522 (9th Cir. 1993) (summary judgment); *Barrett Bus. Servs., Inc. v. Colmenero*, 2023 WL 8935046 (E.D. Wash. Dec. 27, 2023) (same); *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583-84 (7th Cir. 2002) (same); *WorkplaceTechs. Rsch., Inc. v. Project Mgmt. Inst., Inc.*, 664 F. Supp. 3d 1142, 1159 (S.D. Cal. 2023) (evaluating whether trade secret claim was "objectively specious" for purposes of sanctions).

"Having admitted the testimony of [Zunum's] experts, the judge was bound to take their testimony as true for the purposes of considering whether to grant judgment as a matter of law." *Kerchman*, 723 F.3d at 1110-11 (reversing JMOL). This is so even if the experts testified only to their ultimate opinions in conclusory fashion (given FRE 705 permits opinion-only testimony, *see* 31-34, below), but here the experts also explained their methodology and factual bases.

Although the expert testimony discussed in the Order—necessarily accepted as true (per *Kerchman*)—alone permitted the jury to find Zunum's trade secrets existed, the court discussed additional evidence supporting the verdict:

**Trade Secret ("TS" 1).** TS1 concerns "design requirements and objectives for hybrid-electric aircraft relating to three categories of information: (1) range, speed, payload, and economics; (2) aircraft; and (3) noise and runway." 1-ER-19 (quoting 7-ER-1557). Zunum expert Tata testified TS1 was "novel, valuable, [and] kept secret." 1-ER-20. He explained it consisted of "specific technical requirements which [are] used by an engineering organization as their instructions … to design an airplane." 1-ER-21. He discussed his "methodology" for determining if a "trade secret[] derived value from its secrecy." 1-ER-20 n.6. He testified that he "looked … [at] Boeing documentation … to understand what the Boeing technical experts thought of the novelty of [the alleged trade secrets]." *Id*. And he described documents reflecting aspects of TS1. 1-ER-19-20 (discussing 5-

26

ER-924). Knapp likewise discussed TS1, associating it with the court's definitions, tying it to examples, and charting its development. 1-ER-19 (discussing 7-ER-1468); *see* 11-ER-2504:13-2507:15.

**Other Aircraft Trade Secrets (2, 5, 6):** The court's exhibit also defined TS2, TS5, and TS6. 7-ER-1557-1558. Tata described each trade secret, *e.g.*, 1-ER-23 (TS2), and testified each was "novel, valuable, [and] kept secret," having explained his methodology. 1-ER-24-27. He further detailed each trade secret and discussed exemplar documents. 1-ER-22-28. For instance, even the court acknowledged Tata identified "four" "key features" of TS5 and discussed a specific example as to TS6. 1-ER-25-28. Knapp also discussed documents connected to TS2 and TS5, identifying "five slides as 'a good example of Trade Secret 5'"—"the design specifications for Zunum's ZA-10 aircraft"; and Knapp discussed insights relating to TS6. 1-ER-22-27.

**Powertrain Trade Secrets (7, 9-13).** Again, the court's exhibit described each Powertrain Trade Secret, 7-ER-1559-1560, and Zunum expert Andrade summarized TS7 as "a megawatt class hybrid powertrain system" for hybrid-electric aircraft. *E.g.*, 1-ER-28. Andrade added that, after applying his "methodology" (which he described), he concluded each Powertrain Trade Secret was "novel" and "derived value from being kept secret." 1-ER-31. He provided more detailed descriptions and discussed exemplars. 1-ER-28-38. For example,

27

Andrade testified how TS7 was "novel" because, among companies "doing[] proof of concept," "there was no one with this class of airplane that intended to actually make it available for commercial use in the early to mid 20s." 1-ER-29.

Knapp gave more details and examples. For instance, he discussed how TS12 was "a method of flowing down requirements to the component and subcomponent level using full aircraft, full mission simulation and optimization" and how Zunum developed this method to address "shortcomings in the prior art." 1-ER-35. He explained how TS12 helped determine power usage from "battery" versus "actual motor generator power," a key for hybrid-electric aircraft. 1-ER-35.

**Trade Secret 19.** TS19 "comprises a hybrid-electric aircraft and hybrid powertrain development and production plan for market entry in the 2020s." 1-ER-38 (quoting 7-ER-1562). Knapp described it as "part of the commercialization plan, meaning a sequence, a timeline, and additional parts of the commercialization plan[,] … for example, costs, or estimated costs" that comprised a "comprehensive full stack integrated schedule." 1-ER-38. He cited supporting documentary evidence. 1-ER-38 (discussing two exhibits Knapp referenced). And he explained that "components and subsets" of TS19 "were confidential." 1-ER-39. Zunum's expert Garvett testified that TS19 was a "'commercialization plan' or 'business plan' to 'help ensure dealing with new types of aircraft technology, achieving them on a timely basis and also achieving them in a viable cost.'" 1-ER-39. He testified

28

about TS19's novelty, explaining how and why it was "different from the past." 1-ER-39.

*    *    *

In short, Zunum satisfied WUTSA's secrecy-and-novelty elements, and also particularized its trade secrets (although not required). That is especially so given *Kerchman*'s mandate to accept the truth of admissible expert opinions.

Consider the Second Circuit's recent decision in *Syntel*, 68 F.4th 792. The plaintiff (TriZetto) elicited testimony explaining "(1) what the secret was, (2) how the secret was developed, (3) the value of the secret to TriZetto, and (4) that the secret was maintained as confidential." *Id.* at 801. The jury received "a court exhibit ... listing each asserted trade secret by name" and "demonstratives linking the title of each individual trade secret to specific exhibits" and "documents or source code tied to the asserted trade secret." *Id.* The Second Circuit affirmed rejection of a Rule 50 motion: "whether TriZetto's secrets were adequately identified (and proved) was ultimately a question for the jury." *Id.* at 800. And the court found sufficient evidence that 97 manuals and guides were trade secrets based on testimony about *one* "representative example." *Id.* at 803.

Here, more evidence was presented than in *Syntel*, even considering only what the district court discussed. Zunum's experts described each trade secret, used demonstratives to link them to exemplar documents, and—in testimony the

29

court was bound to accept under *Kerchman*—opined that the highly technical information met WUTSA's elements. Knapp explained the trade secrets and their development and value to Zunum, and how they were maintained in confidence. And documents with aspects of Zunum's trade secrets were in evidence. Moreover, as to 'particularization,' the jury had the court's exhibit (which provided more detail than in *Syntel*), and further descriptions by witnesses.

The sufficiency of the evidence is further illustrated by common sense. Imagine a verdict finding misappropriation of a quintessential trade secret, the Coca-Cola formula, based on (1) a court exhibit describing it as a "soda formula"; (2) a technical expert—who survived *Daubert*—testifying the formula was novel, valuable, and secret; (3) a Coca-Cola executive explaining that the formula was useful to produce soda and others had not replicated it; and (4) documents and other evidence about formula development and aspects of the formula, including examples of some public ingredients (sugar, carbonated water). A court would not hesitate to affirm a verdict for Coca-Cola, despite formula ingredients being public, and despite all the formula's details not having been in evidence.

30

### 3.  The district court committed multiple Rule 50 errors.

### <u>The court improperly dismissed Zunum's experts' opinions</u>

The court completely discarded Zunum's experts despite their testimony sufficing because, it asserted, their testimony was "conclusory."  1-ER-20-41.  This reflects multiple errors (putting aside it was not conclusory).

*First*, the court made credibility and weight determinations prohibited under controlling law.  In *Kerchman*, the district court on Rule 50 disregarded the testimony of two plaintiff experts and credited a pro-defendant lab report.  Reversing JMOL, this Court noted the district court's questioning "[d]uring the initial Rule 50(a) hearing": "'I can't take the lab results as true?  I have to take as true a guy that [plaintiff] … paid a fortune?'"  723 F.3d at 1110.  This Court "confirm[ed] [] that, when assessing a Rule 50 motion, the answer to that question is 'yes' if the expert testified for the nonmoving party."  *Id.*

This Court's holding is clear and controlling.  To repeat, "[h]aving admitted the testimony of [the non-movant's] experts, the judge was bound to take their testimony as true for the purposes of considering whether to grant judgment as a matter of law."  *Id.* at 1110-11.  The court below violated that principle.

*Second*, the court's criticism fails on its own terms even if the testimony were "conclusory" because, under FRE 705, "an expert may state an opinion—and give the reasons for it—without first testifying to the underlying facts or data."

31

"Rule 705 functions to abbreviate trials by permitting opinion testimony without factual foundation." *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1576 (Fed. Cir. 1991). Once an expert is qualified, "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *United States v. Protho*, 41 F.4th 812, 822 (7th Cir. 2022) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999)).

It is up to the other side to expose conclusions as unfounded, as Rule 705 "places 'the full burden of exploration of the facts and assumptions underlying the testimony of an expert witness squarely on the shoulders of opposing counsel's cross-examination.'" *Jensen v. EXC, Inc.*, 82 F.4th 835, 862 (9th Cir. 2023) (Wallace, J., concurring and dissenting) (quoting *Smith v. Ford Motor Co.*, 626 F.2d 784, 793 (10th Cir. 1980)); *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1018 n.14 (9th Cir. 2004) (same) (quoting *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004)).

None of the decisions cited below permitted the court to sidestep *Kerchman* or Rule 705. 1-ER-21-22. Two cases are administrative-law proceedings applying the APA rule that federal agencies must provide reasoned explanations.[3] Only two

---

[3] *Sea Robin Pipeline Co. v. FERC*, 795 F.2d 182, 188 (D.C. Cir. 1986) (reversing agency decision); *TQ Delta, LLC v. Cisco Sys.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019) (same, citing APA and patent law).

decisions concern civil-litigation experts, and they address the gatekeeping function at *summary judgment*, where an expert's conclusions cannot, in themselves, create fact disputes. *Ambrosini v. Labarraque*, 966 F.2d 1464, 1470 (D.C. Cir. 1992); *United States v. Various Slot Machines on Guam*, 658 F.2d 697, 701 (9th Cir. 1981).

Here, the court rejected Boeing's *Daubert* challenge to the experts, including that their opinions were conclusory, and held on summary judgment that Zunum's experts' "analyses [we]re sufficient to create a genuine dispute of material fact as to whether the Alleged Trade Secrets were readily ascertainable." 9-ER-2194; *accord Various Slot Machines*, 658 F.2d at 701 ("expert's affidavit" *can* create fact dispute on summary judgment, where "expert stated facts to back up his conclusion").

At trial, the jury heard the experts' conclusions *and* explanations of their methodologies and factual support. Under Rule 705, the experts were not required to put in their entire report, or even explain the basis for their conclusions; rather the burden of attacking those opinions, methodologies, and support rested entirely on Boeing's shoulders. *Mendoza*, 1993 WL 501532 at *1 ("Fed. R. Evid. 705 does not require prior disclosure of underlying facts"; appellants could cross-examine expert on "expert testimony concerning an ultimate issue"). It was for "the jury [to] decide[] how much weight to give [the experts'] testimony," *Primiano v.*

33

*Cook*, 598 F.3d 558, 565 (9th Cir. 2010), and, under Rule 50, the court "was bound to take [it] as true." *Kerchman*, 723 F.3d at 1110-11.

### The court ignored relevant evidence

Although the above evidence sufficed, there was additional relevant evidence the court ignored, further violating Rule 50.

Foremost, the court disregarded what it deemed "key" at summary judgment: "the effort and expense that was expended into developing the information." 9-ER-2192-2193 (citing *Robbins*, 328 P.3d at 911). Voluminous evidence, none discussed by the court, showed multi-million-dollar expenditures; Zunum's expert valued these at **$34.5 million**, quantifying the expenditure for each trade secret. 11-ER-2499:24-2501:22; 11-ER-2536:16-25; 15-ER-3436:21-3437:3; 16-ER-3716:24-3717:9; 16-ER-3734:8-3738:16; 16-ER-3740:21-3741:19.

Combined with evidence of Boeing's difficulty catching up, Zunum's multi-million-dollar investment was potent proof of the secrets' value and novelty. *See Robbins*, 328 P.3d at 911. The jury could also find that Boeing invested millions to access Zunum's IP as low-cost R&D, *supra* at 9—and that Boeing used it— because it was valuable. *E.g.*, 17-ER-3915:2-4 (Boeing expert admitting Boeing used TS1, although disputing any impropriety, and claiming this was "a necessary step for [Boeing] to evaluate the rest of the alleged trade secrets."); 17-ER-3931:8-12; *infra* at 61. And catching up to Zunum was not easy for Boeing. *E.g.*, 6-ER-

1223 (Boeing Thin Haul team seeking "to figure out how [Zunum is] getting better results through different assumptions or approaches"); 6-ER-1225 (on 12/12/17, "Zunum folks pointed out several areas w[h]ere our assumptions and methodology … could get better. Not surprising, given that Matt [Knapp] has been working to refine this technology for 4 years now vs just 5 months for us.").

The court ignored other evidence. It ignored testimony of Zunum experts discussing demonstratives (as in *Syntel*). *E.g.,* 14-ER-3153:11-14; 14-ER-3174:19-24 ("on the left-hand side is Zunum's forecasted component data, which was their trade secret [2]," the novel elements of which are "a roadmap for batteries," "alternate energy sources," and "energy densities and capacities and future upgrades"); 14-ER-3275:13-15; 14-ER-3295:9-23 ("Well, this slide shows—first of all, Trade Secret 11," the novel features of which are how it "fits this particular airplane," "interface[s]," "share[s] power between batteries and the range extender," and the selected "conditions"). It ignored testimony of Boeing experts that supported the existence of trade secrets. *E.g.,* 17-ER-3930:11-18 (TS1 included requirement that "[t]o be competitive economically" aircraft needed specific ranges based on "evolving battery technology"). And it ignored still more evidence. *E.g.*, 3-ER-614; 4-ER-628; 4-ER-651; 4-ER-679; 4-ER-686; 4-ER-731; 4-ER-828; 5-ER-909; 6-ER-1295; 6-ER-1337; 6-ER-1356; 6-ER-1432; 7-ER-1577; 7-ER-1581; 7-ER-1608.

### The court reversed *Reeves*' instructions regarding inferences

Finally, the court repeatedly refused to draw reasonable inferences for Zunum, instead improperly drawing inferences *for Boeing*. For example, a Zunum expert testified TS7 was novel because he reviewed "companies that were … doing[] proof of concept" and found "no one with this class of airplane … intended to actually make it available for commercial use in the early to mid-20s." 1-ER-29. The court thought this testimony "not probative." *Id.* But novelty can be inferred from *one company* (defendant) failing to develop information, for if a "concept really was obvious, [defendant] would have thought of it earlier." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 729 (7th Cir. 2003) (reversing JMOL; secret invented in half hour).[4]

The court also declined to infer that Zunum had valuable secrets because *some* information was public. *E.g.*, 1-ER-20-21; 1-ER-24; 1-ER-26; 1-ER-29; 1-ER-34; 1-ER-39. This misapplies Rule 50 and misunderstands substantive law. "A trade secrets plaintiff need not prove that every element of an information compilation is unavailable elsewhere"—only some aspects need be secret. *Solutec Corp., Inc. v. Agnew*, 1997 WL 794496 at *5 (Wash. Ct. App. Dec. 30, 1997)

---

[4] *See also Modumetal, Inc.*, 425 P.3d at 826 (reversing summary judgment because of fact dispute on novelty, in part because of testimony that one process "was innovative [and] not previously known in the art" and another "was unknown").

(quoting *Boeing*, 738 P.2d at 675). The court cited witnesses testifying to exactly that. 1-ER-39 ("Knapp testified that certain 'components and subsets' of Zunum's commercialization plan were confidential while acknowledging that other aspects of the timeline … were public."). No more is necessary: even when "much of [the trade secret] was known to the industry," a verdict still stands, "because it means that some [information] was *not* known to the industry." *Caudill Seed*, 53 F.4th at 384 (affirming denial of JMOL) (quotation marks omitted).

### B. Substantial evidence supports the jury's IRL verdict.[5]

Under the 2017 IRL, Boeing could not use Zunum's confidences for "any purpose (other than to manage [Boeing's] investment in [Zunum])." 6-ER-1214.[6] Despite holding there was "substantial evidence that [Zunum] shared confidential information with Boeing under the 2017 IRL," the court found insubstantial evidence "that Boeing made [any] unauthorized use" or injured Zunum, and thus displaced the jury's IRL-breach verdict. 1-ER-44. This was error.

---

[5] This claim can stand independently of Zunum's trade-secrets claim. *Rent Info. Tech., Inc. v. Home Depot U.S.A., Inc.*, 268 F. App'x 555, 557-58 (9th Cir. 2008) (holding certain "business requirements" were not trade secrets, but "using" or "disclosing" them could be a breach of contract); 9-ER-2203 (same).

[6] The IRL is governed by Delaware law. 6-ER-1217.

37

### 1. There was substantial misuse evidence.

The court ignored all circumstantial evidence, despite acknowledging its importance on summary judgment. As the court earlier held, "trade secret plaintiffs must often 'construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences.'" 9-ER-2198 (quoting *Modumetal*, 425 P.3d at 879); *accord Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1239 (8th Cir. 1994) ("'direct evidence of industrial espionage is rarely available' and not required").

Trial evidence showed "the defendant's intent to misappropriate the secret" (9-ER-2198) and Boeing's strong motive to misuse Zunum's confidences. Boeing's documented investment rationale, after all, included obtaining "low-cost R&D" and "ensur[ing] IP access … for application to Boeing products." *Supra* at 9. The jury could infer Boeing did just what it set out to do. *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 876 (5th Cir. 2013) (on Rule 50, trade-secret-misappropriation verdict supported by email referring to "harvesting IP"). But the court improperly discredited that obvious inference as a matter of law. *McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412, 1418 (9th Cir. 1989) (reversing JMOL).

In this case, moreover, there was (unusually) direct evidence and admissions that Boeing used Zunum confidences on not one but *four* Boeing R&D programs, and that not one of these programs was pursued by Boeing to manage its Zunum

38

investment.  The court below wrongly confined itself to that direct evidence, and then discarded Rule 50's limits in evaluating it.  The evidence was substantial, and a finding of misuse in any *one* of the *four* programs would support the verdict.

**Boeing's Competitive Assessment**

As one Boeing witness testified, Boeing had "a group [of employees] within product development," known as "CAPE," "that does assessments of concepts, external to Boeing."  14-ER-3242:12-15.  A "main aspect[] of the group," he acknowledged, was to analyze external programs for "Boeing's own product development and competitive assessments," and, indeed, the "CA" in CAPE refers to "competitive assessment."  14-ER-3242:12-22; 14-ER-3269:18-19.

Unbeknownst to Zunum, Boeing invited the engineer "leading the CAPE study of Zunum," Kevin Gosling, to Zunum's technical-workshop meeting on December 12, 2017.  6-ER-1221.  In an internal chat, Wong, another Boeing engineer who attended, wrote that the invitation was not "a good idea," "mostly because" of his CAPE role, but higher-ups already "approved it."  6-ER-1221.  The meeting happened, and Zunum shared substantial confidences.  6-ER-1266-1268; 11-ER-2547:15-2548:2; 14-ER-3143:1-3144:5.  Three days later, Gosling received a spreadsheet based on and incorporating Zunum's information that "compar[ed] the Boeing hybrid/electric concept vs. Zunum's."  7-ER-1577; 14-ER-3143:12-3144:10, 14-ER-3147:12-3148:14; 11-ER-2562:21-2565:12 (Knapp testifying that

39

"tab 2" in 6-ER-1337, also attached to 7-ER-1577, reflects information shared at December 2017 workshop).

On January 8, 2018, the CAPE lead (Gosling) sent an email with the subject "Zunum Hybrid-Electric Eval" to around twenty Boeing employees, 6-ER-1234, attaching a presentation, which described "Data Acquisition," referencing "Zunum" and the December 12, 2017 technical meeting ("Boeing Meeting 12/12/17 – Data sharing/Eval"), 6-ER-1266. The deck detailed Zunum specifications and operating costs. 6-ER-1265-1276. And it discussed just one other company—Airbus, Boeing's principal competitor. 6-ER-1265; 12-ER-2783:13-14. A jury could reasonably infer Gosling obtained Zunum data at the December 2017 workshop (particularly as it was summarized in the December 15, 2017 spreadsheet), and improperly used it for CAPE—rather than only to "manage [Boeing's] investment." 6-ER-1214.

The district court nonetheless stated "the only evidence Zunum cites regarding improper 'data acquisition' is a single slide with the words 'data acquisition' on it"; "[t]here is no basis to conclude that this slide was referring to acquisition of data from Zunum, let alone the acquisition of information disclosed under the 2017 IRL"; and "Zunum fails to provide any evidence that Mr. Gosling actually acquired any information from Zunum," 1-ER-44-45.

This reflects numerous errors. As just noted, there *was* evidence Gosling attended the workshop, and also evidence he "acquired [] information from Zunum" (*id.*): the spreadsheet he received (7-ER-1577). And Gosling's presentation (the "CAPE deck") was not just a "single slide" supporting an inference of improperly acquired Zunum confidences (although that would suffice), but a presentation assessing two competitors—Zunum and Airbus—half of which detailed secrets learned from Zunum. 6-ER-1265-1276.

Disregarding the CAPE deck, the court stated "the presentation is dated January 8th, 2017 [citing 6-ER-1265], two months before Zunum and Boeing executed the 2017 IRL." 1-ER-45. But the presentation was distributed on January 8, 201<u>8</u>, with actual content dating it well after the IRL, indicating that the date on the cover reflected a commonplace, start-of-the-year typo. The presentation was emailed on January 8, 2018—exactly 365 days after the date on the cover. Moreover, as noted, the first substantive page refers to the "12/12/17" meeting. 6-ER-1266. The following page said there was "[n]o further news as of Jan 8th, 2018." 6-ER-1267. Other presentation content post-dated January 2017. *E.g.*, *id.* (discussing "4Q, 2017" events). The court was required to "draw" the "reasonable inference[] in favor of [Zunum]" that the cover had a typo, *Reeves*, 530 U.S. at 150, rather than reweigh the evidence itself. That aside, the court's

41

inference was patently unreasonable, given all the evidence the cover year was a typo (including the December 12, 2017 meeting Gosling was invited to).

The district court also cited an October 2017 email from Gosling as proof he did not conduct an improper competitive assessment of Zunum. That email said, "[w]e've been asked to help evaluate the Zunum hybrid-electric airplane concept." 1-ER-46 (quoting 6-ER-1236). This does not contradict the inference that Gosling's "evaluat[ion]" was for the "competitive" assessment he led, and it certainly does not require the contrary inference.

### Boeing's Copycat Program (Thin Haul)

Additional direct evidence shows that Boeing used Zunum confidences improperly to advance Boeing's own hybrid-electric R&D, including the "Thin Haul" program. *AtriCure, Inc. v. Jian Meng*, 842 F. App'x 974, 982 (6th Cir. 2021) ("'relying on the trade secret to assist or accelerate research or development' is a use") (quoting *Wellogix*, 716 F.3d at 877).

This evidence was substantial. Boeing's technical advisor to Zunum (Fernandes), who launched Thin Haul, testified he "instructed the team" to use Zunum confidences, including "assumptions that Zunum was using in their vehicle and the requirement of what the vehicle was supposed to do." 13-ER-2889:17-2890:6. Those engineers had access to, and some admitted to using, Zunum confidences for technical analyses and to compare results. 13-ER-3092:12-17, 13-

42

ER-3095:10-20; 14-ER-3235:23-3236:2. Zunum's experts testified about Boeing's use of Zunum confidences in Boeing's copycat program. *E.g.*, 14-ER-3173:12-3182:5. Zunum also pointed to the information exchange at the December 2017 workshop (the one Gosling attended), since some attendees were "working on the [copycat] aircraft" (i.e., Thin Haul). 15-ER-3400:20-3402:20; 12-ER-2689:19-2690:2. As noted, after the workshop, Boeing circulated a spreadsheet comparing Zunum's specifications, assumptions, and requirements with Boeing's. 7-ER-1577; 14-ER-3143:12-3144:10; 14-ER-3147:12-3148:14; *see also* 6-ER-1225 ("there's more work to be done"). Finally, Fernandes obtained confidences subject to the IRL (*supra* at 7-8); the jury could infer Thin Haul used some of them.

Although Boeing argued Thin Haul only existed to evaluate its investment, 13-ER-2886:17-20, despite Thin Haul being launched *after* the investment, the jury was not obligated to accept Boeing's explanation, particularly given evidence showing Boeing pursued other, improper purposes, like exploring competing opportunities. Fernandes, who ran Thin Haul, told colleagues he was "working very closely with some individuals to kick off a electric-hybrid airplane concept from scratch." 13-ER-2899:2-19. Documents show he was "planning [Boeing's] own [demonstrator]," 5-ER-1009, assessing whether "Boeing would launch this," 5-ER-1004, and deciding whether to go to "market with our own airplane," 7-ER-1661. Shumate, the Project Manager, admitted partnering with Zunum was "not

43

the only thing we studied." 13-ER-3089:12-17. Fernandes also testified about an email discussing how "if Boeing decline[d] the relationship option, Zunum w[ould] either dissolve or w[ould] find a different viable option to compete with Boeing Thin Haul," further showing Boeing considered having Thin Haul compete with Zunum. 13-ER-2924:2-2925:3 (acknowledging this reflected a "possible future[]").

The jury could infer that Thin Haul had one impermissible purpose. In fact, the court earlier denied summary judgment because "a reasonable jury could find that one purpose of the [copycat program] was to design a competing aircraft system rather than to simply assess Zunum's claims." 9-ER-2202.

Yet on Rule 50 the court ignored most of this evidence—it did not mention Fernandes's testimony—and improperly construed what evidence it did mention in Boeing's favor. For instance, it brushed aside the post-workshop spreadsheet based on supposedly "necessary context and … inconvenient portions." 1-ER-47-48. The jury was not required to adopt the court's gloss as the "one reasonable conclusion." *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283, 1287 (9th Cir. 2001). Kumar drew the opposite inference when Boeing sent him the spreadsheet by error. 15-ER-3414:22-3415:20 (inferring from it that "a major goal of [Boeing's at the] workshop … was to take insights from our program and put that into Boeing's hybrid activities"). The jury could conclude likewise.

**Electric Lab**

Kamiar Karimi, a Boeing engineer, testified that he attended an internal Thin Haul workshop in November 2017 (where Zunum confidences were discussed) and started E-Lab "to continue Boeing's research and development initiative around electric propulsion in a lab setting." 14-ER-3330:24-3331:5. It was to be "completely independent of Zunum" and advance Boeing's own R&D, so the IRL barred using Zunum confidences for this purpose. 14-ER-3327:12-3328:11; 5-ER-1000; *see also* 5-ER-1200 (recommending in November 2018 that Boeing "fully leverage our investment in Zunum to grow our knowledge and experience and retain access to IP").

The court acknowledged there was "a motive for Boeing to want to use Zunum's technology in the electric lab." 1-ER-50. And there was substantial evidence that E-Lab, built on the back of Boeing's misappropriations in Thin Haul, did so. Karimi, the E-Lab leader, was "curious" about what Zunum was doing and staffed the lab with seven Thin Haul engineers exposed to Zunum confidences. 14-ER-3334:16-3337:24. The E-Lab team continued to access Zunum confidences: in the summer of 2017, Kumar sent confidential information to Karimi, 4-ER-731, including its "battery roadmap," 4-ER-758; 14-ER-3287:3-21. Zunum expert Andrade testified, citing documents, that Karimi "immediately forwarded [it] to … a Boeing battery specialist," 14-ER-3287:15-21, who worked

45

on E-Lab, 14-ER-3335:4-11. And Karimi attended the December 2017

workshop—he was the one who invited Gosling, 6-ER-1221; 7-ER-1579; 6-ER-

1225 ("Kamiar [Karimi] … was poking [Zunum's] assumptions" at meeting).

Moreover, Andrade testified, citing his "experience" running a "very

sophisticated lab" for UTAS, that those "enhancing [Boeing's] lab" would benefit

from Zunum's roadmap. 14-ER-3287:3-14. On cross-examination, Andrade

added he "personally visited [Boeing's] 787 lab" while at UTAS, and "it didn't

have the capability to test a one-megawatt [powertrain] with this size of battery and

so forth," and "documentation [he] read" showed Boeing was "using [Zunum's]

information to be able to actually enhance that lab." 14-ER-3305:19-3306:3.

Despite this, the court reweighed the evidence and held a jury could not

conclude that E-Lab used *any* Zunum confidences. 1-ER-49-52. It repeated the

refrain that Andrade's testimony was "conclusory" (itself error under *Kerchman*)

but omitted or misread key details. For example, the court critiqued Andrade for

not "explain[ing] whether th[e battery] roadmap was confidential," 1-ER-50, but

Tata testified that it was, 14-ER-3174:6-18; 14-ER-3181:23-3182:5, as did

Zunum's co-founder, 11-ER-2516:5-2517:2.

The court also discounted additional evidence supporting an inference that

Boeing, through E-Lab, used Zunum confidences to pitch Zunum's prospective

partners, including Safran. The evidence showed "Boeing had been running off

46

with the engine majors to go develop a competing hybrid [electric] aircraft," 15-ER-3397:1-18, pitching "designs, market perspectives, [and] technology forecasts" similar to Zunum's, 6-ER-1228. Indeed, Karimi, the E-Lab leader, proposed Boeing partner with Safran on hybrid-electric technologies and an engine similar to Zunum's. 6-ER-1209; 6-ER-1344; 14-ER-3328:13-3329:2; 14-ER-3338:9-23.

Given Boeing's access to Zunum confidences, the similarity of electrical components it proposed co-developing with Safran, and Karimi's desire to learn from Zunum (*e.g.*, 14-ER-3334:16-23; 14-ER-3339:14-3341:17; 14-ER-3343:4-19; 5-ER-1000; 6-ER-1221; 6-ER-1225; 6-ER-1437; 7-ER-1577), a jury could infer misuse. *See* Menell, *supra*, § 7.3.2.3; *Modumetal*, 4 Wash. App. at 824.

Still, the court said "Zunum provided no evidence of similarities between its confidential information and any of Boeing's supposed 'programs' or 'products.'" 1-ER-51. But Zunum's expert did testify about similarities between Boeing's E-Lab and Zunum's confidences, including its battery roadmap, copper-bird plans, and one-megawatt hybrid configuration with plans to integrate a third-party motor controller. 14-ER-3286:18-3288:2 (addressing demonstrative discussing novel features of Zunum's Powertrain Trade Secrets, re-appearing in technical E-Lab documents), 14-ER-3324:9-3325:15.

The court disregarded this evidence because "Zunum's expert testified that such a motor was 'sanctioned by the FAA' and 'nothing unique.'" 1-ER-51. But

47

that is not what Andrade testified.  He said "*540 volts* is common for FAA certified components" and "nothing unique," but that was true only for "[t]he *voltage itself*"—as he testified, Zunum's innovation was to "develop a one-megawatt system, [which was] new."  14-ER-3301:24-3302:6 (emphasis added).

**Electra**

A Boeing executive testified that, post-October 2018, it wanted to incubate a new venture (now Electra) to "replace" Zunum.  15-ER-3594:13-20.  That same executive proposed this new venture "[i]nvestigate Zunum IP."  7-ER-1555.  Further, the business plan for Electra expressly said it "buil[t] on excellent work" from Boeing's Thin Haul copycat program, while identifying Zunum as a competitor.  *See* 6-ER-1443, 6-ER-1449.  Not surprisingly, Electra's founder requested a "[f]ull indemnification" from Boeing "against any claims from Zunum[,]" 7-ER-1567, further demonstrating misuse.  *See DSC Commc'ns Corp. v. Next Level Commc'ns*, 929 F. Supp. 239, 248 (E.D. Tex. 1996) (relevant that defendants felt "indemnity agreements" were "necessary to 'insure' against the contingency that they might be found to have stolen DSC's trade secrets").

The court erred in discounting this evidence.  It considered just two of six exhibits Zunum cited, and placed great weight on testimony that Boeing never signed an MOU with Electra, invested, or indemnified it.  1-ER-52.  Accepting that self-serving testimony was error (*Palin*, 113 F.4th at 264), but anyway it was

48

irrelevant. A jury could *still* find that Boeing misused Zunum confidences to explore a new venture—a breach of the IRL—and given Boeing's aggressive misuse of Zunum's IP, a jury could infer some Zunum confidences made their way to Electra. 6-ER-1441–43 (attaching "the latest deck of Electra, John Langford's business" which flags "Zunum" as competitor and credits the "Thin Haul Study" and its project manager (Shumate), who was exposed to Zunum confidences); *see also B12 Consulting, LLC v. UST Global, Inc.*, 2024 WL 885035, at *3 (9th Cir. Mar. 1, 2024) (finding substantial evidence supported jury verdict based on one witness' testimony and single signed invoice).

### 2. There was substantial causation-and-injury evidence.

Whether a breach caused injury is a quintessential jury question. *See Culver v. Bennett*, 588 A.2d 1094, 1098 (Del. 1991) ("the issue of proximate cause is ordinarily a question of fact to be submitted to the jury"); *supra* n.6 (IRL subject to Delaware law). Here, a jury could find that Boeing's repeated misuse of Zunum's confidences harmed Zunum.

Delaware courts find harm where, for example, the breach of confidentiality obligations lead to a "decrease[]" in plaintiff's "negotiating position," *eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *19-20 (Del. Ch. Sept. 30, 2013), or where it results in economic losses, *Agilent Technologies, Inc. v. Kirkland*, 2010 WL 610725, at *23-31 (Del. Ch. Feb. 18, 2010). And in analogous

49

trade-secret cases, courts permit recovery of the full value of a business where "misappropriation created a competitive disadvantage," and "this disadvantage caused [plaintiff's] value to drop to 'zero.'" *Wellogix*, 716 F.3d at 879-80.

Viewed through Rule 50's lens, the evidence permitted such findings here. Zunum kept its secrets confidential out of concern a competitor might run off with them, 11-ER-2501:7-14; that is exactly what Boeing did, using Zunum confidences on competing programs and shopping them to the market. Boeing's E-Lab leader, who used Zunum's confidences, met with Safran to discuss "Hybrid and All Electric airplanes," 6-ER-1209, and asked Safran to "build a 500-kilowatt motor for [the] electric lab," the same motor Zunum was developing. 14-ER-3343:4-19; *supra* at 13, 47-48. After that, Boeing tried to reconstruct with Safran "a market play similar to what Zunum was attempting," and later used Zunum's confidences to launch Electra. *Supra* at 11.

A jury could reasonably conclude Boeing's breaches affected competition— and, indeed, led to Zunum losing the value of its confidences and the cratering of its business. *See eCommerce*, 2013 WL 5621678, at *19-20; *Wellogix*, 716 F.3d at 879-80. As Kumar wrote to Boeing's board observer, "confusion [was] created at Safran following meetings at Boeing about Boeing vs Zunum electric aircraft activities." 6-ER-1228. Boeing's observer agreed the email's "content [was] factual." *Id*. A jury could infer Boeing-caused confusion harmed Zunum,

50

especially given evidence that Safran retracted its proposal to invest because of Boeing. *E.g.,* 6-ER-1353 (Safran "unlikely to close round due to concerns that its investment would be seen as a negative to Boeing"); *infra* at 53-55 (describing Boeing actions causing Safran not to invest). The result: Zunum ceased operations, 12-ER-2831:4-9, while Electra, seeded with Zunum confidences to "replace Zunum," got a three-billion-dollars order book. As Knapp testified, "it should have been us." 11-ER-2603:5-24.

There was more evidence still. As detailed below at 61, the evidence showed Zunum was worth $163 million in March 2018, $110.7 million of which corresponded to the value of Zunum's confidences, 16-ER-3729:8-11, 16-ER-3734:22-3735:2, but "essentially zero" after November 2018, 16-ER-3733:12-24; 16 ER 3752:3-18 ("Zunum could no longer monetize the trade secrets" after it "went out of business"). The jury could find Boeing's misuse caused this value-destruction. *Wellogix*, 716 F.3d at 879-80.

The district court disregarded this evidence, again substituting its views for the jury's. The court's causation analysis, however, collapses with its erroneous finding that there was no misuse. 1-ER-54 (dismissing evidence as "say[ing] nothing about whether Boeing was advancing competing programs to Safran ***using information protected under the 2017 IRL***" (emphasis added)).

51

Moreover, the premise of Zunum's causal claim is not "groundless and conjectural," but much the same as what both *Wellogix* and the court below (at summary judgment) accepted: defendant's misuse of plaintiff's confidences to explore the market, disrupting it and ultimately leading to plaintiff's demise. 9-ER-2210. The court got it right the first time. *See City Solutions, Inc. v. Clear Channel Communications*, 365 F.3d 835, 840 (9th Cir. 2004) (given "highly subjective nature of [] causation," it "is properly left to a jury") (reversing JMOL).

### C. Substantial evidence supported the tortious-interference verdict.

To establish tortious-interference, Zunum had to show Boeing intentionally and improperly interfered with a valid business expectancy of Zunum's that resulted in injury. *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 930 P.2d 288, 300 (Wash. 1997) (en banc). Undoing the jury's verdict, the district court addressed only the business expectancy element. It erred.

### 1. The "prospective expectancy" evidence was substantial.

To prove an actionable "*prospective*" expectancy, "Washington courts require a plaintiff to show *only* that its future business opportunities are a *reasonable expectation* and not merely wishful thinking." *Greensun Group, LLC v. City of Bellevue*, 436 P.3d 397, 405 (Wash. Ct. App. 2019) (emphasis added).

Zunum's evidence was substantial. Kumar testified that "Safran reached out to [Zunum] cold, in May [2017], with a proposal to invest and partner" and

followed up with "a letter of intent in December 2017 for a $5 million or greater investment, in early 2018." 15-ER-3407:24-3409:14. There were then lengthy negotiations, and Zunum "had support from very senior [Safran] leaders." 15-ER-3423:6-11.

After July 2018, when a potential deal with another company (UTAS) failed to close, 15-ER-3419:3-15, Zunum moved quickly toward closing with Safran, clearing multiple "preconditions for financing," such as "clos[ing] [a] multibillion-dollar turbo shaft contract with Safran helicopter engines," having "Safran['s] R&D division complete[] an assessment of the aircraft," and "exchang[ing] terms" with "Safran Corporate Ventures." 15-ER-3420:16-23; 15-ER-3421:12-18. A September 2018 email from Kumar to Boeing noted Zunum's cash problem but discussed how he had "pitched to the Safran executive committee in Paris [that] Wednesday, and feedback was very good." 6-ER-1349.

In internal discussion about Kumar's email and Safran's proposed terms, Boeing executives did not suggest this was all "wishful thinking" (as the district court hypothesized), but expressed concern about a "VERY Safran favorable" proposal, as against what Boeing would get. 6-ER-1346-1347. One executive worried about Kumar "do[ing] something that hurts [Boeing] to save the company," i.e., accept Safran's terms, noting that if Zunum went "bankrupt," Boeing would get "first dibs on [Zunum's] IP and assets." *Id.* Another stated he

53

"really dislike[d]" Safran's "way too Safran friendly" proposal.  6-ER-1346.  That led the senior-most Boeing executive to ask, "[w]hat leverage do we have on the Safran deal, if we don't like it let's use the leverage."  *Id.*

Zunum responded to Safran's proposal with a counterproposal that valued the company at $89 million and expressed a willingness to negotiate further.  15-ER-3426:16-24.  Zunum and Safran then "schedule[d] a closing where a large contingent [from Safran] flew [from France] to Kirkland, on October 23rd."  15-ER-3554:6-10.  Knapp also testified about this, stating that "Safran sent a phalanx of vice presidents from France to go through this and finalize this investment" on October 23.  11-ER-2580:5-14.  But, Knapp testified, the closing "f[e]ll apart at the last moment" even though it "didn't make sense … .  We had met all the requirement.  We had run hard.  We had checked every box.  People had come all the way from France."  11-ER-2582:3-15; 15-ER-3422:15-3423:11 (Kumar).

Meanwhile, internal Boeing documents showed that, right after Boeing's executives discussed their "leverage" to stop the deal, they spoke to Safran (without Zunum), and reported internally Safran was "unlikely to close [the] round due to concerns that its investment would be seen as a negative to Boeing."  15-ER-3587:4-10-3588:25; 6-ER-1353.  A few months later, after Zunum ceased operations, when Boeing was courting Safran alone (to "reconstitut[e] a market play similar to what Zunum was attempting"), it noted Safran *was* "interested [in

Zunum] but chose not to invest after we [Boeing] elected not to participate and not to endorse Zunum." 6-ER-1437.

A jury could reasonably conclude based on this evidence that Zunum and Safran were "contemplating a contract, with at least a reasonable expectancy of fruition." *Scymanski v. Dufault*, 80 Wash.2d 77, 84-85 (Wash. 1971) (en banc); *Wall v. Olympic Vista Development*, 2004 WL 1557311, at *4 (Wash. Ct. App. Mar. 2, 2004) (finding tortious interference from disparaging remarks to "potential [condo] buyer and again to a person he thought was a potential buyer"). Indeed, short of a contract itself, it is difficult to imagine what additional evidence could be required.

### 2. The district court again violated Rule 50.

In overriding the jury, the court failed to "give credence to the evidence favoring the nonmovant" and to "draw all reasonable inferences in favor of the nonmoving party," instead making inferences and "reweighing" the evidence in Boeing's favor. *Reeves*, 530 U.S. at 150. It ignored nearly all the evidence just discussed, including the year and a half preceding October 2018 and Safran's letter of intent. Instead, the court simply declared Zunum had no "reasonable expectation of a valid business expectancy" because "Zunum's hope that Safran would raise its valuation and pursue a deal on its founders' terms was nothing more than wishful thinking." 1-ER-58.

55

Rule 50 does not permit the court to draw such inferences. In the first place, evidence of "Zunum's hope" for more money reflects what any rational businessperson would want—the best deal possible; it does not displace evidence that an agreement was near. Anyway, Knapp testified, "[o]n the subject of inflexible valuations, I had been party to those communications, and we had reduced our valuation first to $125 million, then down to $89 million, so that Safran would be happy to invest. And Safran was, in fact, happy to invest at 89 million[.]" 11-ER-2599:21-25; 12-ER-2805:9-15. Kumar's testimony buttressed the inference Safran valued Zunum above $89 million. 15-ER-3430:18-20 ("So Safran with DiamondStream had put forward $125 million when they did the assessment. I think in that, the Safran number was $104.").

And there was additional evidence (ignored below) that cash-strapped Zunum was prepared to compromise further, *contra* 1-ER-57-58. As Kumar testified: "in October [2018] I even told Boeing, repeatedly, that we were open to even unreasonable terms." 15-ER-3426:22-24. Boeing itself worried he would "hurt[] [Boeing]" to "save" Zunum by accepting unreasonable terms. 6-ER-1347.

The court improperly ignored yet more on-point evidence. That includes Boeing's September 2018 email about using its "leverage" against a "Safran friendly" deal, 6-ER-1346, and contemporaneous Boeing documents stating Safran would be "unlikely to close" with Zunum "due to concerns that its investment

56

would be seen as a negative to Boeing," 6-ER-1353—not, as the court declared, due to the founders. *See also* 6-ER-1437.

Ignoring evidence suffices to require reversal. But the court also made improper credibility determinations justifying reversal. "Judgment as a matter of law cannot be granted on an issue that turns on witness credibility." *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009). Still, the court disregarded Knapp's testimony about the October 23 meeting with Safran, stating "Zunum introduced no additional evidence to corroborate Mr. Knapp's testimony." 1-ER-58. The testimony *was* corroborated (in addition to the above-cited evidence, *see, e.g.*, Kumar's testimony, 15-ER-3422:3-23). Moreover, whether Knapp's testimony was credible or reflected "hubris" was for the jury, not the court.

## II.     THE COURT SHOULD DENY BOEING'S NEW-TRIAL REQUEST

### A.     This Court should decide the new-trial issue *de novo*.

Under Rule 50(c)(1), a "district court must, after granting judgment as a matter of law, also rule on the motion for a new trial" conditionally. *Acosta v. City and County of San Francisco*, 83 F.3d 1143, 1148 (9th Cir. 1996), *abrogated on other grounds*, 2024 WL 3250380 (9th Cir. July 1, 2024). Where a district court does not, this Court has "discretion to either remand to the district court to let it decide the new trial motion or to decide the new trial motion [itself]." *Id.* at 1149.

**1**.  The district court's new-trial ruling here was a nullity given that court lacked jurisdiction to issue it.  On appeal from a final judgment, this Court "may properly exercise appellate jurisdiction" over an alternative new-trial motion, conducting *de novo* review where a district court "fail[s] to issue a conditional ruling."  *Vollrath Co. v. Sammi Corp.*, 9 F.3d 1455, 1458-59 (9th Cir. 1993).  Here, the Rule 50 order did not include a conditional new-trial ruling, and Zunum appealed.  18-ER-4124.  Thus, this Court has plenary jurisdiction to address the Rule 50(c) issue *de novo* under *Vollrath*, and the district court could not nullify that jurisdiction.  Indeed, under FRAP 4(a)(4), a notice of appeal divests a district court of jurisdiction unless a qualifying motion, such as under Rule 60, is pending. *Williams v. Woodford*, 384 F.3d 567, 582-86 (9th Cir. 2004).  None was, and Boeing's new-trial motion came after Zunum first appealed.  2-ER-64; 1-ER-4.

**2**.  The new-trial ruling suffers from substantive flaws too.  The court provided no analysis, perfunctorily citing "the reasons discussed in the court's August 14, 2024 order and Boeing's motion for judgment as a matter of law or, in the alternative, for a new trial."  1-ER-5.

The court's legally erroneous Rule 50 ruling, however, cannot support its new-trial ruling.  *Wallace*, 479 F.3d at 630 ("Because the district court based its grant of a new trial on its analysis of the [] motion for judgment as a matter of law,

58

[its] errors of law [on the JNOV ruling] compel us to conclude that the district court abused its discretion in ordering a new trial.").

Insofar as the court relied on "reasons" in "Boeing's motion," it is unclear whether these are separate from its infirm Rule 50 ruling, and (if separate) what reasons were offered. Presumably, it did not rely on *all* of Boeing's arguments, given that it rejected several. *E.g.*, 1-ER-42-44. It presumably also declined Boeing's invitation to reverse itself on pretrial rulings. And Boeing waived many arguments. So why did it grant relief? The court's failure to "record its reasoning in a manner sufficient to permit the 'proper application of the abuse of discretion standard on appellate review'" makes review impossible. *Cf. Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998).

For these reasons, this Court should exercise its "discretion … to decide the new trial motion [itself]"—*de novo*. *Acosta*, 83 F.3d at 1149.

### B.    Boeing's new-trial motion was meritless.

"A district court may not grant a new trial simply because it would have arrived at a different verdict" and may *not* "substitute its evaluations for those of the jurors." *Tortu v. Las Vegas Metropolitan Police Dep't*, 556 F.3d 1075, 1084 (9th Cir. 2009) (citation omitted). Retrial is available "only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious

evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007).

### 1. The verdict was not "against the clear weight of the evidence."

To grant retrial of a verdict as "against the clear weight of the evidence," "the judge on the entire evidence," while "having given full respect to the jury's findings," must be "left with the definite and firm conviction that a mistake has been committed." *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987); *Tortu*, 556 F.3d at 1078 (reversing new-trial order).

To repeat, the Rule 50 ruling cannot support a new trial given the legal errors infecting it. *Wallace*, 479 F.3d at 630. "A trial court is rarely entitled to disregard jury verdicts that are supported by substantial evidence." *Duk v. MGM Grand Hotel, Inc.*, 320 F.3d 1052, 1058 (9th Cir. 2003). Here, moreover, although Boeing attacked the sufficiency of pro-jury-verdict evidence, 9-ER-2097-98, 9-ER-2103-2104; 9-ER-2111-2113, it never collected pro-Boeing evidence, or showed it would so tip the scales as to render the verdict (despite substantial pro-Zunum evidence) "against the clear weight of the evidence." *Tortu*, 556 F.3d at 1078. It was not, and the court could not reweigh the evidence. *Id.* at 1084.

### 2. Boeing is not entitled to a new damages trial.

Courts "must uphold the jury's damages verdict 'whenever possible, and all presumptions are in favor of the judgment,'" *DSPT Intern., Inc. v. Nahum*, 624

F.3d 1213, 1224 (9th Cir. 2010), and courts "allow substantial deference to a jury's finding of the appropriate amount of damages," *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996). A new damages trial cannot be ordered "unless the amount is 'grossly excessive or monstrous,' clearly not supported by the evidence, or 'only based on speculation or guesswork.'" *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1297 (9th Cir. 1984).

**Trade Secrets and IRL Breach.** The jury's award of $67.08 million for trade-secret and breach-of-IRL losses, awarded once to avoid duplication, is "within the range supported by the record." *Fontana Prods. Inc. v. Spartech Plastics Corp.*, 6 Fed. Appx. 591, 595 (9th Cir. 2001).

Zunum's damages expert Bratic valued Zunum at $163 million based on Boeing's internal ("Catalyst") valuation of Zunum. 16-ER-3720-3729. He also derived a trade-secret value of $110.7 million, 16-ER-3734:5-37385:13. These became "essentially zero" after Boeing's misconduct, 16-ER-3733:17-24; 16 ER 3752:3-18. Boeing's damages expert (Mody) submitted no valuation. 16-ER-3821:16-3822:2. And although she cited two valuations in the record that conflicted with Bratic's valuations, Bratic explained why those were inapt. 16-ER-3729:21-3731:24.

The jury could also rely on evidence of investors valuing Zunum at or above ~$90 million. 11-ER-2599:21-25; 12-ER-2805:9-15; 15-ER-3426:14-20; 7-ER-

61

1571.  In valuing Zunum pre-collapse, the jury could also consider Boeing's willingness to invest hundreds of millions, 6-ER-1285; 15-ER-3564:19-3565:10, Boeing sizing the market at $1 trillion, 5-ER-1020, and Electra's $3 billion-plus in orders, 16-ER-3732:16-20.  Meanwhile, following Zunum's demise, Knapp valued Zunum's assets at $5 million.  12-ER-2807:23-2808:11.

The award is well supported by the evidence.  The jury could find that the difference between Bratic's number, as adjusted given the partial verdict, and the post-November 2018 value was $67.08 million.  *Union Oil Co. of California v. Terrible Herbst, Inc.*, 331 F.3d 735, 743 (9th Cir. 2003) (reversing new-trial order: "the jury returned a verdict of approximately $800,000 less than [was] requested"; potential "discounting" not a "justification for disregarding the jury's verdict").

The unjust-enrichment award of $14.15 million also does not warrant retrial.  The award was permitted (RCW § 19.108.030(1)), and Bratic valued unjust-enrichment damages at an incremental $34.5 million.  16-ER-3738:15-3742:9.

***Tortious Interference***.  The $11.56 million award was not "monstrous."  Bratic calculated $163 million.  16-ER-3717:2-4.  The evidence allowed a finding that, in addition to trade-secret-and-contract losses (valued by the jury at $67.08 million) and avoiding double-recoveries, Zunum lost an extra $11.56 million from the Safran expectancy.  Kumar testified that, upon Safran investing $5 million, Boeing would add $10 million.  15-ER-3420:3-15; 15-ER-3431:22-3432:19.

In short, "where, as here, the jury's verdicts find substantial support in the record and lie within the range sustainable by the proof, [the court] will not 'play Monday morning quarterback' and supplant the jury's evaluation of the complex and conflicting evidence with our own." *Los Angeles Memorial Coliseum Com'n v. National Football League*, 791 F.2d 1356, 1366 (9th Cir. 1986).

### 3. Boeing's grab-bag of new-trial arguments is meritless.

**Questioning and counsel argument**.  Boeing complained post-trial about a handful of questions made during trial and comments during post-trial argument. 9-ER-2097; 9-ER-2112.  Boeing did not contemporaneously object during questioning or closing arguments, meaning retrial is available only if "necessary to prevent a miscarriage of justice" and plain error "prejudi[ces] or affect[s] substantial rights." *Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503, 517 (9th Cir. 2004).  There was neither here; the questions were fair, and the post-trial argument proper.

**Verdict inconsistency.**  Boeing argued the pro-Zunum trade-secret verdict was inconsistent with the jury rejecting the claim for breach of the pre-investment confidentiality agreement (the PIA).  9-ER-2098; 9-ER-2103-2104.  Any challenge to "alleged inconsistency" in a general verdict is waived if not raised "prior to the dismissal of the jury." *Williams v. Gaye*, 895 F.3d 1106, 1130 (9th Cir. 2018); *Kode v. Carlson*, 596 F.3d 608, 611 (9th Cir. 2010).  Boeing did not timely raise

this argument, so it is waived. Regardless, inconsistent general verdicts do not permit re-trial, *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003), and, moreover, there was no inconsistency.

**Barrett *Daubert*.** On trade secrets, Boeing's expert Barrett wanted to testify about purported "flaws in Zunum's aircraft design" based on models he created. 9-ER-2098. The court twice excluded this irrelevancy. 16-ER-3870:21-3871:5; 10-ER-2259:19-25. Boeing sought retrial, but the ruling is entitled to deference (and was right, not clearly wrong). Regardless, "[a] new trial is only warranted when an erroneous evidentiary ruling 'substantially prejudiced' a party," *Harper v. City of Los Angeles*, 533 F.3d 1010, 1030 (9th Cir. 2008), and Barrett *did* testify to performing "fabrication and testing of physical models that you can hold"; "the [air]craft in all of its incarnations, were not certifiable," he said, as "neither stable nor controllable on the ground, or in the air." 17-ER-3919:14-3921:19. Thus, Boeing was not prejudiced by the court's rulings.

**Kumar Hearsay**. On tortious interference, Boeing complained Kumar "relay[ed] significant and prejudicial hearsay regarding why Safran did not invest[.]" 9-ER-2112. But the hearsay testimony was negligible, particularly given the balance of evidence showing interference, and the court cured any prejudice by sustaining Boeing's objections and instructing the jury to disregard hearsay. 15-ER-3418:20-3419:1; 15-ER-3423:15-3424:5; *see Doe ex rel. Rudy-*

*Glanzer v. Glanzer*, 232 F.3d 1258, 1270 (9th Cir. 2000) (noting "strong presumption that the curative instructions … were followed[.]").

**First Amendment**. On tortious interference, Boeing also complained "the jury was not instructed to disregard" "internal Boeing documents reflecting [Boeing disclosing to Safran] truthful information and pure opinion statements." 9-ER-2111. This holds no water. The jury was properly instructed that, to impose liability, it was required to find improper motive or improper means, *see Leingang*, 930 P.2d at 300, meaning it necessarily rejected Boeing's free-speech 'defense.'[7]

**Bratic *Daubert***. Boeing contested Zunum damages expert Bratic's reliance on (1) Boeing's "Catalyst" valuation of Zunum, and (2) a Zunum spreadsheet allocating development costs. 9-ER-2125 (citing 9-ER-2113-2117). Boeing says Bratic never validated the data, but is wrong. 16-ER-3719:7-3729:19 (Catalyst valuation); 16-ER-3735:14-3736:13; 16-ER-3788:15-3789:16 (spreadsheet). Regardless, "[e]xperts can rely on data provided to them without independent verification because the 'factual basis of an expert opinion goes to the credibility of

---

[7] *Elcon Const., Inc. v. Eastern Washington Univ.*, 174 Wash. 2d 157, 169 (2012) (implying that a letter could constitute interference, without regard to truth/falsity, if "motivated by greed, retaliation, or hostility"); *Pleas v. City of Seattle*, 112 Wash. 2d 794, 805-06 (1989) (rejecting argument that improper interference was "privileged" conduct).

the testimony, not the admissibility." *Mighty Enters., Inc. v. She Hong Industrial Co. Ltd.*, 745 Fed. Appx. 706, 709 (9th Cir. 2018).

## III.   THE CASE SHOULD BE REASSIGNED AND REMANDED

This Court should remand for disposition of Zunum's motion requesting interest, exemplary damages, and other relief.  1-ER-59 (finding it "moot").

Moreover, this Court should reassign the case to prevent the appearance of partiality, given Judge Robart's disclosure of Boeing-stock trades.  *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 867 (1988) ("failure to disqualify" after learning of financial interest in party "constituted a violation of [28 U.S.C.] § 455(b)(4)"); *Preston v. U.S.*, 923 F.2d 731, 734 (9th Cir. 1991) (statute "covers circumstances that *appear* to create a conflict of interest, whether or not there is actual bias").  Zunum does not make this request lightly.  That the court issued its disclosure only after giving Boeing Rule 50 relief, after speaking with the press (*supra* n.1),[8] and after Zunum appealed underscores the necessity, as does the court's conditional new-trial order the day after it disclosed, entered without jurisdiction, without reasoning, and before Zunum's deadline to oppose.

---

[8] *United States v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993) (discussing case with media "an unusual thing for a judge to do"); Code of Conduct for U.S. Judges, Canon 3(A)(6) ("A judge should not make public comment on the merits of a matter pending or impending in any court.").

## CONCLUSION

The jury verdict should be reinstated, and the case remanded to a different judge.

Date: December 16, 2024

Respectfully submitted,

/s/ Vincent Levy

Vincent Levy
Scott Danner
Jack L. Millman
Brian T. Goldman
Charlotte Baigent
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Ave
New York, New York
T: 646-837-5120
E: vlevy@hsgllp.com

*Attorneys for Plaintiff-Appellant Zunum Aero, Inc.*

67

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**: 24-5212, 24-5751 _____

I am the attorney.

**This brief contains 13,989 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** /s/ *Vincent Levy* _____ **Date:** December 16, 2024

# ADDENDUM

**ADDENDUM**

**Rule 50. Judgment as a Matter of Law in a Jury Trial; Related Motion for a New Trial; Conditional Ruling**

**(a) Judgment as a Matter of Law.**

> **(1)** *In General.* If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> > **(A)** resolve the issue against the party; and
> >
> > **(B)** grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.
>
> **(2)** *Motion.* A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

**(b) Renewing the Motion After Trial; Alternative Motion for a New Trial.** If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

> **(1)** allow judgment on the verdict, if the jury returned a verdict;
>
> **(2)** order a new trial; or
>
> **(3)** direct the entry of judgment as a matter of law.

**ADD-1**

**(c) Granting the Renewed Motion; Conditional Ruling on a Motion for a New Trial.**

> **(1) *In General.*** If the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed. The court must state the grounds for conditionally granting or denying the motion for a new trial.

> **(2) *Effect of a Conditional Ruling.*** Conditionally granting the motion for a new trial does not affect the judgment's finality; if the judgment is reversed, the new trial must proceed unless the appellate court orders otherwise. If the motion for a new trial is conditionally denied, the appellee may assert error in that denial; if the judgment is reversed, the case must proceed as the appellate court orders.

**(d) Time for a Losing Party's New-Trial Motion.** Any motion for a new trial under Rule 59 by a party against whom judgment as a matter of law is rendered must be filed no later than 28 days after the entry of the judgment.

**(e) Denying the Motion for Judgment as a Matter of Law; Reversal on Appeal.** If the court denies the motion for judgment as a matter of law, the prevailing party may, as appellee, assert grounds entitling it to a new trial should the appellate court conclude that the trial court erred in denying the motion. If the appellate court reverses the judgment, it may order a new trial, direct the trial court to determine whether a new trial should be granted, or direct the entry of judgment.

**Wash. Rev. Code § 19.108.010.  Definitions**.

Unless the context clearly requires otherwise, the definitions set forth in this section apply throughout this chapter.

(1) "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means;

(2) "Misappropriation" means:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of the trade secret; or

(ii) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was (A) derived from or through a person who had utilized improper means to acquire it, (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

(3) "Person" means a natural person, corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision or agency, or any other legal or commercial entity.

(4) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

**ADD-3**

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.