Docket Nos. 24-5212 (L), 24-5751

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ZUNUM AERO, INC.,

*Plaintiff, Counter-Defendant and Appellant*

**v.**

THE BOEING COMPANY AND BOEING HORIZONX VENTURES, LLC,

*Defendants, Counter-Claimants, and Appellees*

*Appeal from the United States District Court for the Western District of Washington, No. 2:21-cv-00896 The Honorable James L. Robart*

## ANSWERING BRIEF FOR APPELLEES THE BOEING COMPANY AND BOEING HORIZONX VENTURES, LLC

John C. Hueston, Esq.
Moez M. Kaba, Esq.
Yegor Fursevich, Esq.
HUESTON HENNIGAN LLP
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone: (213) 788-4340
Facsimile: (888) 866-4825
Jhueston@hueston.com
Mkaba@hueston.com
Yfursevich@hueston.com

David A. Perez
Susan E. Foster
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Telephone: (206) 359-8000

## Rule 26.1 Corporate Disclosure Statement

Defendant-Appellee The Boeing Company has no parent corporation and no publicly held corporation owns 10% or more of its stock. The Boeing Company is Defendant-Appellee Boeing HorizonX Ventures, LLC's sole member.

Dated: February 24, 2025

**HUESTON HENNIGAN LLP**

By: */s/ Yegor Fursevich*
John C. Hueston
Moez M. Kaba
Yegor Fursevich

*Attorneys for Defendants-Appellees*
*The Boeing Company and Boeing*
*HorizonX Ventures, LLC*

# TABLE OF CONTENTS

Page

Rule 26.1 Corporate Disclosure Statement ................................................ i

ISSUES PRESENTED ............................................................................. 1

INTRODUCTION ................................................................................... 2

STATEMENT OF THE CASE .................................................................. 4

    I.    Factual Background ................................................................. 4

    II.   Procedural Background .......................................................... 8

SUMMARY OF ARGUMENT ................................................................ 12

STANDARD OF REVIEW .................................................................... 15

ARGUMENT ....................................................................................... 16

    I.    The district court correctly granted JMOL ........................... 16

        A.    Boeing was entitled to JMOL on Zunum's trade-secret
            misappropriation claim ................................................. 16

            1.   Zunum was required to present evidence
                identifying its Alleged Trade Secrets ................. 16

            2.   Zunum failed to prove each element of its
                misappropriation claim ...................................... 24

            3.   The district court properly applied the standard
                under FRCP 50 ................................................... 35

        B.    Boeing was entitled to JMOL on Zunum's claim for
            breach of the IRL ......................................................... 40

            1.   Zunum failed to present evidence that it disclosed
                confidential information to Boeing under the IRL
                ............................................................................. 40

TABLE OF CONTENTS (cont.)

Page

2. Zunum failed to present evidence that Boeing misused any information disclosed under the IRL ............................................................. 42

3. Zunum failed to present sufficient evidence of harm from alleged breach of the IRL ................. 51

C. Boeing was entitled to JMOL on Zunum's claim for tortious interference .................................................... 54

1. The evidence failed to establish that Zunum had a reasonable business expectancy with Safran .. 54

2. The evidence at trial failed to establish the other elements of Zunum's tortious-interference claim ............................................................. 56

3. The district court properly applied FRCP 50 ..... 60

D. Boeing is entitled to JMOL because substantial evidence does not support the jury's damages award . 63

II. In the alternative, the district court did not abuse its discretion in granting Boeing's motion for a new trial ......... 71

A. The district court retained jurisdiction to rule on the new-trial motion after Zunum appealed ...................... 71

B. The district court did not abuse its discretion in conditionally granting Boeing's motion for a new trial ............................................................. 72

III. If remand is necessary, reassignment is unwarranted ........ 75

CONCLUSION ........................................................... 77

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Ambrosini v. Labarraque,*
  966 F.2d 1464 (D.C. Cir. 1992) ............................................................ 37

*Anheuser-Busch, Inc. v. Nat. Beverage Distributors,*
  69 F.3d 337 (9th Cir. 1995) .................................................................. 15

*ASSE Int'l, Inc. v. Kerry,*
  803 F.3d 1059 (9th Cir. 2015) .............................................................. 15

*Bianco v. Globus Med., Inc.,*
  2014 WL 5462388 (E.D. Tex. Oct. 27, 2014) ...................................... 21

*Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.,*
  53 F.4th 368 (6th Cir. 2022) ................................................................ 21

*Chin v. Port Auth. of N.Y. & N.J.,*
  685 F.3d 135 (2d Cir. 2012) ................................................................ 75

*Dees v. Cnty. of San Diego,*
  960 F.3d 1145 (9th Cir. 2020) ................................................. 15, 72, 73

*Dice Corp. v. Bold Techs.,*
  556 F. App'x 378 (6th Cir. 2014) ........................................................ 20

*DSC Commc'ns Corp. v. Next Level Commc'ns,*
  929 F. Supp. 239 (E.D. Tex. 1996) ...................................................... 50

*E.F. Hutton & Co. v. Arnebergh,*
  775 F.2d 1061 (9th Cir. 1985) .............................................................. 74

*Eagle Grp., Inc. v. Pullen,*
  114 Wash. App. 409 (2002) .................................................................. 66

## TABLE OF AUTHORITIES (cont.)

Page(s)

*eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678 (Del. Ch. Sept. 30, 2013)..................................................................52

*Ed Nowogroski Ins., Inc. v. Rucker*,
971 P.2d 936 (Wash. 1999) .........................................................19, 24

*Gilbrook v. City of Westminster*,
177 F.3d 839 (9th Cir. 1999)................................................................15

*Greensun Grp., LLC v. City of Bellevue*,
7 Wash. App. 2d 754 (2019) ...................................................54, 57, 60

*IDX Sys. Corp. v. Epic Sys. Corp.*,
285 F.3d 581 (7th Cir. 2002)...............................................................20

*Imax Corp. v. Cinema Techs., Inc.*,
152 F.3d 1161 (9th Cir. 1998).......................................................17, 18

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
978 F.3d 653 (9th Cir. 2020).......................................................passim

*Koch v. Mut. of Enumclaw Ins. Co.*,
108 Wash. App. 500 (2001) .................................................................59

*Kode v. Carlson*,
596 F.3d 608 (9th Cir. 2010)...............................................................73

*Krechman v. Cnty. of Riverside*,
723 F.3d 1104 (9th Cir. 2013).............................................................36

*Lakeside-Scott v. Multnomah Cnty.*,
556 F.3d 797 (9th Cir. 2009).......................................................passim

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
694 F.3d 51 (Fed. Cir. 2012)...............................................................75

TABLE OF AUTHORITIES (cont.)

Page(s)

*Leibsohn Prop. Advisors Inc. v. Colliers Int'l Realty Advisors (USA), Inc.,*
177 Wash. App. 1021 (2013) ................................................................ 70

*Lies v. Farrell Lines, Inc.,*
641 F.2d 765 (9th Cir. 1981) ............................................................... 39

*Life Designs Ranch, Inc. v. Sommer,*
191 Wash. App. 320 (2015) ................................................................. 60

*Liljeberg v. Health Servs. Acquisition Corp.,*
486 U.S. 847 (1988) ............................................................................. 75

*Magnetar Techs. Corp. v. Intamin, Ltd.,*
801 F.3d 1150 (9th Cir. 2015) ........................................................ 64, 65

*MAI Sys. Corp. v. Peak Comput., Inc.,*
991 F.2d 511 (9th Cir. 1993) ............................................................... 17

*Mallet & Co. Inc. v. Lacayo,*
16 F.4th 364 (3d Cir. 2021) ................................................................. 19

*Miller v. Glenn Miller Prods., Inc.,*
454 F.3d 975 (9th Cir. 2006) ............................................................... 61

*Molski v. M.J. Cable, Inc.,*
481 F.3d 724 (9th Cir. 2007) ............................................................... 74

*Munoz v. Orr,*
200 F.3d 291 (5th Cir. 2000) ............................................................... 65

*Murphy v. City of Long Beach,*
914 F.2d 183 (9th Cir. 1990) ............................................................... 74

TABLE OF AUTHORITIES (cont.)

Page(s)

*Next Comm'ns, Inc. v. Viber Media, Inc.*,
   758 F. App'x 46 (2d Cir. 2018) ............................................................. 19

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000) ..................................................... 18, 36, 39, 40, 60

*Schroeder v. McDonald*,
   55 F.3d 454 (9th Cir. 1995) ................................................................. 71

*Scymanski v. Dufault*,
   80 Wash. 2d 77 (1971) ......................................................................... 56

*Softel, Inc. v. Dragon Med. & Sci. Comm'ns, Inc.*,
   118 F.3d 955 (2d Cir. 1997) ................................................................. 67

*Surfvivor Media, Inc. v. Survivor*,
   *Prods.*, 406 F.3d 625 (9th Cir. 2005) .................................. 15, 56, 63, 74

*Surrell v. California Water Serv. Co.*,
   518 F.3d 1097 (9th Cir. 2008) ............................................................. 37

*Synfuel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*,
   68 F.4th 792 (2d Cir. 2023) ................................................................. 20

*TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*,
   966 F.3d 46 (1st Cir. 2020) ................................................................. 19

*Unelko Corp. v. Rooney*,
   912 F.2d 1049 (9th Cir. 1990) ............................................................. 59

*United States v. Various Slot Machines on Guam*,
   658 F.2d 697 (9th Cir. 1981) ............................................................... 37

*Wall v. Olympic Vista Development*,
   2004 WL 1557311 (Wash. Ct. App. Mar. 2, 2004) .............................. 56

## TABLE OF AUTHORITIES (cont.)

Page(s)

*Weigel v. Target Stores,*
    122 F.3d 461 (7th Cir. 1997) ................................................................ 37

*Westmark Development Corp. v. City of Burien,*
    140 Wash. App. 540 (2007) .................................................................. 58

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,*
    259 F.3d 1101 (9th Cir. 2001) .............................................................. 76

*Zhang v. Am. Gem Seafoods, Inc.,*
    339 F.3d 1020 (9th Cir. 2003) .............................................................. 73

Statutes

28 U.S.C. § 455(f) ...................................................................................... 76

28 U.S.C. § 1454(a) ..................................................................................... 8

Cal. Civ. Proc. Code § 2019.210 ............................................................... 17

Wash. Rev. Code § 19.108.010(4) ............................................................. 24

Rules

Federal Rule of Civil Procedure 50 .............................................. 35, 37, 60

Fed. R. App. P. 4(a)(4)(A)(iv)-(v), 4(a)(4)(B)(i) ....................................... 71

Federal Rule of Evidence 703 ................................................................... 37

Federal Rule of Evidence 705 ................................................................... 40

Wash. Gen. Rule 14.1(a), (c) ..................................................................... 56

Other Authorities

Jager, et al., 2 § Law § 22:16 (2024) ........................................................ 22

- vii -

# TABLE OF AUTHORITIES (cont.)

Page(s)

James Pooley, et al., Trade Secrets § 11.02 (2025) ...........................21, 22

Restatement (Second) of Torts § 772 (1979)............................................59

Restatement (Third) of Unfair Competition § 45 ...................................66

## ISSUES PRESENTED

I.    Whether Zunum Aero, Inc. ("Zunum") needed to present substantial evidence identifying each Alleged Trade Secret with sufficient particularity to separate it from matters of general knowledge.

II.   Whether Zunum failed to present substantial evidence establishing each element of its trade-secret misappropriation claim.

III.  Whether Zunum failed to present substantial evidence establishing each element of its claim for breach of a 2017 Investor Rights Letter.

IV.   Whether Zunum failed to present substantial evidence establishing each element of its tortious-interference claim.

V.    Whether Zunum failed to present substantial evidence supporting damages.

VI.   Whether, in the alternative, the district court abused its discretion in granting The Boeing Company and HorizonX Ventures, LLC (collectively, "Boeing") a new trial on Zunum's claims.

VII.  Whether the case should be reassigned if remanded.

- 1 -

## **INTRODUCTION**

Zunum was once an ambitious startup that sought to build hybrid electric aircraft capable of revolutionizing air travel. Founded in 2013, Zunum claimed that it had discovered how to achieve significant operating cost savings that would make such an aircraft commercially viable. But despite these grandiose claims, Zunum could not secure any funding: hundreds of potential investors rejected Zunum because its aircraft concept was too speculative and unproven.

Following years of rejection, Zunum approached Boeing for investment. Recognizing how risky Zunum's ideas were, Boeing nevertheless agreed to loan Zunum $9 million to see if Zunum's claims could be validated. Unfortunately, after using Boeing's funds to expand its team, Zunum made little progress in proving the feasibility of its ideas, constructing a prototype, or securing further investments. In late 2018, Zunum ran out of money and furloughed its employees. As Zunum's cofounder candidly remarked, "The crisis [was] of [Zunum's] own making."

Two years later, Zunum changed course and began blaming its "crisis" on Boeing. It brought this lawsuit, alleging that Boeing had

misappropriated its trade secrets, breached certain confidentiality agreements, and interfered with potential investments.

A seven-day jury trial produced a split verdict. Boeing moved for judgment as a matter of law ("JMOL"), and the district court properly exercised its gatekeeping function by entering judgment in Boeing's favor. As the district court detailed in its 53-page order, the trial record revealed an absence of substantial evidence (or, in some instances, any evidence) supporting Zunum's trade-secret misappropriation, breach-of-contract, and tortious-interference claims. 1-ER-7. Indeed, Zunum's theories rested on nothing but "speculation" and "preposterous logical inferences rather than fact or evidence." 1-ER-44-59.

Each of Zunum's attempts to overturn that ruling fails. Just as it did below, Zunum mischaracterizes the record, misstates the law, and impermissibly relies on speculation.

## STATEMENT OF THE CASE

### I.    Factual Background

In 2013, two engineers, Matthew Knapp and Ashish Kumar, founded Zunum with an ambitious goal of building small hybrid-electric airplanes to transport passengers over short distances.  11-ER-2478, 2481.  For four years, the two founders struggled to secure funding, relying primarily on personal cash.  11-ER-2606-2607.  Zunum was rejected by over 80 venture capital firms, 150 private investors, and many governmental grant programs, largely because Zunum had no concrete technology and its concept was unproven and risky.  *Id.*; 12-ER-2635, 2673.

In 2016, Dr. Kumar used a friend who worked at Boeing to secure introductions, hoping that Boeing would fund or partner with Zunum.  13-ER-2948-49.  Zunum's effort to persuade Boeing to invest centered on a claim to have dramatically reduced the operating costs of the small planes Zunum hoped to build.  12-ER-2847.  Boeing was interested in whether that claim could be validated.  *See* 13-ER-2952-56.

The parties signed a Proprietary Information Agreement in August 2016 ("PIA").  13-ER-2956-57.  The PIA authorized Boeing to use Zunum's proprietary information "to explore the feasibility of

- 4 -

potential projects in the field of electric based power systems for aviation use." 13-ER-2957. After signing the PIA, Zunum disclosed to Boeing documents regarding Zunum's concept and held several in-person workshops. 14-ER-3216-17. Boeing then conducted a high-level assessment of Zunum's claims. 13-ER-2966-67.

Those efforts led to Zunum securing its first investors in March 2017: HorizonX Ventures, LLC ("HorizonX") and JetBlue Technology Ventures. 12-ER-2659. HorizonX, which The Boeing Company had formed to make venture capital-style investments in aerospace, loaned $5 million to Zunum. 13-ER-2966-67, 17-ER-3979. HorizonX sought to help Zunum succeed and—if Zunum could show that its ambitious claims were valid—develop an eventual partnership with Zunum. 13-ER-2955-56. Alongside HorizonX's loan, the parties signed an Investor Rights Letter ("IRL"), which allowed Boeing to use Zunum's proprietary information "to manage [Boeing's] investment in [Zunum]." 12-ER-2836.

In the following months, Boeing considered how to best manage its investment and whether it should pursue a partnership with Zunum to develop hybrid-electric aircraft. Between June and November 2017, HorizonX commissioned and conducted a conceptual design project known as the Thin Haul Study to more thoroughly analyze Zunum's

- 5 -

claims about the purported advantages of its aircraft concept, as well as Zunum's business model and the potential market for its ideas. 13-ER-2971-72. This sort of study is common in the aerospace industry, in which one company uses its own tools, methods, and assumptions to test the validity of another's claims. 13-ER-2981.

At no point during this study did Boeing use Zunum's confidential information. Indeed, doing so would have undermined the study's very purpose—whether Boeing could, using its *own* tools and information, validate Zunum's claims by modeling a notional aircraft that showed similar results. 13-ER-2988. The only information relating to Zunum that Boeing used was high-level constraints, such as the aircraft being capable of seating nine passengers and flying at least 500 nautical miles. 13-ER-2990. These constraints were well-known from Zunum's own public and marketing materials. 13-ER-2990; 14-ER-3194-95, 3304. After Boeing's engineers drew up a notional aircraft (referred to as the BHE-9) on paper, Boeing conducted a technical deep dive to analyze whether it validated Zunum's claims. 13-ER-2994-95. It did not, so Boeing concluded that Zunum's claims were overblown. *Id.*

In December 2017, Boeing met with Zunum to explain the Thin Haul Study and review its findings. 13-ER-2983, 13-ER-3001. Far from

crying foul, Zunum engaged with Boeing, insisting that Boeing's BHE-9 concept was "very different" from Zunum's aircraft to convince Boeing that Zunum's claims could still be validated. 15-ER-3508.

By early 2018, Zunum had nearly exhausted the money Boeing had loaned it. 12-ER-2809. Even though Boeing could not validate Zunum's claims, HorizonX continued to support Zunum because it did not want to see its portfolio company fail so soon after the first loan. 15-ER-3600-02. Accordingly, Boeing gave Zunum a "bridge" loan of $4 million in May 2018. 12-ER-2724.

Unfortunately, the strategic partnership Boeing hoped for never materialized. Zunum made little progress in demonstrating the feasibility of its aircraft concept or building a prototype, and was unable to secure further investments. *See* 12-ER-2769. The failure to secure funding resulted from Zunum's leadership's adamant refusal to accept a realistic valuation, insisting Zunum was worth up to five times the amounts investors proposed. 12-ER-2808; 15-ER-3512-3513. Investors criticized Dr. Kumar as "delusional," finding outlandish his assertions that Zunum was worth anywhere from $160 million to $220 million. 12-ER-2818; 15-ER-3511. Even Mr. Knapp admitted that Dr. Kumar "clearly failed to perform in his role as CEO." 12-ER-2815.

- 7 -

Zunum ran out of cash in November 2018. 15-ER-3538. Zunum furloughed all its employees and ceased operations. *Id.* As Mr. Knapp commented then, Zunum had no one to blame but itself: "[T]he crisis is of our own making." 11-ER-2597.

## II. Procedural Background

Two years after Zunum's collapse, Zunum filed the underlying lawsuit, blaming its "crisis" on Boeing. 1-ER-9. Boeing counterclaimed for breach of various loan agreements, declaratory judgment that Boeing did not breach confidentiality agreements, and declaratory judgment that Boeing was the true inventor of certain patents put at issue by Zunum's complaint. 1-ER-10. Boeing removed under 28 U.S.C. § 1454(a). *Id.*

Boeing eventually moved for summary judgment. 9-ER-2186. The district court granted summary judgment to Boeing on Zunum's claim for breach of contract based on a 2018 Investor Rights Letter (and Boeing's reciprocal declaratory-judgment counterclaim); Zunum's claim for breach of an implied covenant of good faith and fair dealing; Zunum's claim for tortious interference with certain potential investment partners; and Boeing's claim for declaratory judgment of patent inventorship. 9-ER-2214-15. After supplemental briefing, the

district court also granted summary judgment to Boeing on its counterclaims for breach of loan agreements, awarding Boeing several million dollars in damages. 1-ER-10-11. This appeal concerns none of these summary judgment rulings.

Zunum's remaining claims were tried to a jury. 11-ER-2400. Those claims were for (1) misappropriation of trade secrets; (2) breach of confidentiality agreements; and (3) tortious interference with alleged business expectancies.

After a seven-day trial, the jury returned a split verdict. *See* 9-ER-2131-40. The jury found Boeing misappropriated eleven of Zunum's nineteen Alleged Trade Secrets ("ATS"), breached the IRL but not the PIA, and tortiously interfered with one of Zunum's alleged business expectancies. *Id.*

Boeing timely moved for JMOL or, in the alternative, a new trial. *See* 9-ER-2057-2127.

The district court granted Boeing's motion for JMOL. 1-ER-7-8. As to Zunum's trade-secret misappropriation claim, the district court concluded that "Zunum failed to identify any of its [ATS] with sufficient particularity or prove by substantial evidence that its [ATS] derived

- 9 -

value from not being generally known to or readily ascertainable by others." 1-ER-17, 19-41.

As to Zunum's claim for breach of the IRL, the district court determined that "Zunum failed to provide substantial evidence that [Boeing's] use of any [confidential information governed by the IRL] was unauthorized or that Boeing's alleged breach injured Zunum." 1-ER-41. The district court concluded that Zunum "fail[ed] to cite any evidence creating a non-speculative inference that Boeing improperly used any information protected under the 2017 IRL." 1-ER-44-53. The district court added that any alleged breach of the IRL did not cause any harm to Zunum and that Zunum's theory "rest[ed] on a series of preposterous logical inferences rather than fact or evidence." 1-ER-53.

Finally, as to Zunum's tortious-interference claim, the district court concluded that "Zunum failed to provide substantial evidence that Zunum had a valid business expectancy with Safran," a third-party supplier. 1-ER-56. Particularly, the district court determined that Zunum's trial evidence "supports only one conclusion: Zunum did not have a reasonable expectation of a valid business expectancy with Safran" and "Zunum's hope that Safran would raise its valuation and

pursue a deal on its founders' terms was nothing more than wishful thinking." 1-ER-58.

The district court issued a further order under Rule 50(c)(1) conditionally granting Boeing's motion for a new trial on each of Zunum's claims because the jury's verdict was "against the clear weight of the evidence, the awarded damages are excessive, and . . . a new trial is otherwise necessary to prevent a miscarriage of justice and undue prejudice to Boeing." 1-ER-4-5.

## SUMMARY OF ARGUMENT

*First*, the district court correctly granted JMOL on Zunum's trade-secret misappropriation claim. Zunum failed to present substantial evidence identifying its ATS at trial. Contrary to Zunum's contentions, this Court has repeatedly held that a trade-secret claim fails as a matter of law without such evidence. *See, e.g.*, *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020) ("Courts and juries require precision [in identification of trade secrets] because . . . the trier of fact will not have the requisite expertise to define what the plaintiff leaves abstract."). No Washington court has held otherwise. Zunum also failed to present substantial evidence that its ATS were novel, valuable, or used by Boeing.

*Second*, the district court correctly granted JMOL on Zunum's claim for breach of the IRL. Zunum did not present evidence of any confidential information disclosed under the IRL. The only two documents Zunum identified at trial as having been disclosed under the IRL reflected public information. Nor did Zunum present substantial evidence that Boeing misused any documents governed by the IRL. And even if such evidence existed, the district court correctly concluded

- 12 -

that "Zunum did not provide substantial evidence of any harm resulting from Boeing's alleged breach." 1-ER-53.

*Third*, the district court correctly granted JMOL on Zunum's tortious-interference claim. The jury found that Boeing interfered with Zunum's prospective business expectancy with Safran. But Zunum presented no evidence of the tort's elements—in particular, that Zunum reasonably expected to consummate a business deal with Safran. Indeed, the evidence showed that Zunum and Safran were far apart in their negotiations, with Safran rejecting Zunum's offers as ridiculous and as overinflating Zunum's value, and with Zunum referring to Safran as a "bad actor."

*Fourth*, Boeing is independently entitled to JMOL because Zunum did not present substantial evidence supporting any damages—just the unreliable testimony of its damages expert, which the district court described as "extremely shaky" and appropriate for challenge under Rule 50. That expert's highly speculative and unjustifiable leaps of logic, and reliance on unverified data, rendered his opinions unreliable and inadmissible. And even if it were admissible, his testimony is not substantial evidence supporting damages.

- 13 -

*Fifth*, in the alternative, the district court did not abuse its discretion in conditionally granting Boeing's motion for a new trial because the jury's verdict in Zunum's favor ran against the clear weight of the evidence.

*Finally*, Zunum's request that the case be reassigned should be denied. Below, Zunum never asked that the district judge recuse; given that forfeiture, it cannot pursue equivalent relief through the back door. Regardless, the district judge has no actual or perceived conflict of interest.

## STANDARD OF REVIEW

The district court's grant of Boeing's motion for JMOL is reviewed *de novo*. *Gilbrook v. City of Westminster,* 177 F.3d 839, 864 (9th Cir. 1999). This Court may affirm the judgment on any basis supported by the record. *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005).

The district court's grant of a new trial is reviewed for abuse of discretion. *Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337, 346 (9th Cir. 1995). Abuse of discretion exists only where the district court "based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1071 (9th Cir. 2015). The district court's decision to grant a new trial must stand "unless the jury's verdict is supported by the clear weight of the evidence" and none of the district court's grounds for granting a new trial is reasonable. *Dees v. Cnty. of San Diego*, 960 F.3d 1145, 1155 (9th Cir. 2020).

# ARGUMENT

## I. The district court correctly granted JMOL.

### A. Boeing was entitled to JMOL on Zunum's trade-secret misappropriation claim.

#### 1. *Zunum was required to present evidence identifying its Alleged Trade Secrets.*

Zunum first argues that the district court erred in granting JMOL on its trade-secret misappropriation claim because there was no requirement to "identify" its alleged "trade secrets with sufficient particularity" at trial. AOB 21-25. Zunum is wrong.

This Court has long held that a misappropriation claim fails as a matter of law unless the plaintiff presents evidence identifying its alleged trade secrets with particularity. Most recently, the Court applied this principle in *InteliClear*. There, the Court held that, to survive summary judgment, the plaintiff must "prove ownership of a trade secret" by presenting evidence "describ[ing] the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge." 978 F.3d at 658 (cleaned up). As the panel explained, "[i]dentifying trade secrets with sufficient particularity is important because . . . [c]ourts and juries . . . require precision" to

- 16 -

assess the merits of a misappropriation claim. *Id.* Indeed, "especially where a trade-secrets claim involves a sophisticated and highly complex system, the district court or trier of fact will not have the requisite expertise to define what the plaintiff leaves abstract." *Id.*

This Court has applied the same requirement for trade-secret identification at least two other times. *See Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1166 (9th Cir. 1998) (affirming summary judgment dismissing trade-secrets claim because plaintiff "failed to carry its burden of identifying for the court exactly what . . . it claimed as trade secrets"); *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 520 (9th Cir. 1993) (reversing grant of summary judgment in plaintiff's favor because plaintiff failed "to specifically identify[] [its software] trade secrets").

Zunum devotes just a single sentence and footnote to these binding, on-point authorities. Zunum first argues that they are inapt because they applied "California law, which expressly requires specificity as a matter of notice 'before commencing discovery.'" AOB 24-25 (citing Cal. Civ. Proc. Code § 2019.210). But none of those cases addressed § 2019.210 or California procedure. In fact, *Imax* and *MAI Systems* involved California law *before* § 2019.210 was enacted. And

- 17 -

*InteliClear* addressed substantive elements of both California law and the federal Defend Trade Secrets Act, which is materially identical to Washington's Uniform Trade Secrets Act ("WUTSA").

Zunum next argues that these cases are inapplicable because they supposedly involved "mandatory pre-trial disclosures, rather than post-trial review." AOB 25. Not so. All three decisions considered the evidentiary standard a plaintiff must meet to avoid dismissal as a matter of law. While these decisions concerned summary judgment, "[t]he standard for [JMOL] under Rule 50 mirrors the standard for summary judgment under Rule 56." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135 (2000). Indeed, the identification requirement applies with equal force at trial (and, necessarily, during post-trial review). *InteliClear*, 978 F.3d at 658 (explaining that the plaintiff must identify trade secrets with particularity because "[c]ourts *and juries* . . . require precision" (emphasis added)); *Imax*, 152 F.3d at 1167 (explaining that the identification requirement is necessary because "it is unlikely that the district court or *any trier of fact* would have expertise in discerning exactly [what constitutes] trade secrets" (emphasis added)).

- 18 -

Zunum not only failed to address these on-point authorities; it also did not show that the Supreme Court of Washington would interpret WUTSA any differently.  Nor could it.  That court has held that WUTSA should be "construed" to "make uniform the law" across jurisdictions that have enacted the Uniform Trade Secrets Act, like California and federal law.  *Ed Nowogroski Ins., Inc. v. Rucker*, 971 P.2d 936, 946 (Wash. 1999).  There is thus no reason to believe that the Washington Supreme Court would interpret WUTSA to differ from the materially identical statutes at issue in this Court's prior cases.

Unsurprisingly, this Circuit is not alone in requiring a plaintiff to present evidence identifying its claimed trade secrets with particularity. Many other circuits impose this same requirement.  *See, e.g.*, *TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*, 966 F.3d 46, 54 (1st Cir. 2020) (reversing summary judgment for plaintiff and awarding judgment to defendant "as a matter of law" because "plaintiff failed to identify trade secrets with specificity"); *Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 49 (2d Cir. 2018) (affirming summary judgment because plaintiff "fail[ed] to describe its [alleged trade secret] with sufficient particularity"); *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 382-84 (3d Cir. 2021) (holding that the "trade secret must be described

- 19 -

'with sufficient particularity'" (citation omitted)); *Dice Corp. v. Bold Techs.*, 556 F. App'x 378, 385 (6th Cir. 2014) (affirming summary judgment because plaintiff did not "identify trade secret with specificity"); *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581-84 (7th Cir. 2002) (affirming summary judgment because plaintiff failed to present evidence identifying its alleged trade secrets).

Zunum cites nothing contradicting this weight of authority. In fact, Zunum cites no cases holding that a trade-secret plaintiff may prevail without presenting evidence identifying the information it claims as its trade secret. While Zunum mentions two cases from the Second and Sixth Circuits for the proposition that a plaintiff need not "particulariz[e]" its alleged trade secrets "at trial," AOB 23, neither case supports that assertion.

The Second Circuit case held the exact opposite: that a plaintiff "bears the burden of identifying a purported trade secret with sufficient specificity" to "allow[] a factfinder to determine whether certain information is, in fact, a trade secret." *Synfuel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 800-01 (2d Cir. 2023). Applying that principle, the Second Circuit found that "extensive testimony" at trial "identifying and describing the trade secrets,"

- 20 -

including "a thorough overview of [the software's] functionality" and the "competitive advantage each piece of software provide[d]," carried the plaintiff's burden. *Id.* at 801-03.

The Sixth Circuit case applied the same principle. *See Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 380-81 (6th Cir. 2022) ("[A] trade-secrets plaintiff must define the information for which protection is sought with sufficient definiteness to permit a court to apply the criteria for protection . . . ."). The proposition for which Zunum cites *Caudill* addressed "combination trade secret[s]," a concept not at issue here. *Id.* at 380.[1]

Zunum also relies on a purportedly "leading" treatise written by its *amicus curiae*. AOB 22-23 (citing James Pooley et al., Trade Secrets § 11.02(2)(c) (2024)). But Mr. Pooley's treatise does not support Zunum's position.

To begin, no court has accepted the notion for which Zunum cites Mr. Pooley's treatise—that a plaintiff need not present evidence

---

[1] Zunum also cites an unpublished district-court decision that addressed an unrelated issue: whether a defendant can be liable for misappropriation even if it had not acquired all elements of an alleged trade secret. *See Bianco v. Globus Med., Inc.*, 2014 WL 5462388, at *6-7 (E.D. Tex. Oct. 27, 2014).

identifying its alleged trade secrets with specificity at trial to prevail. Even Mr. Pooley does not state—in any of his publications—that a plaintiff need not present such evidence at summary judgment or trial. Indeed, Mr. Pooley's treatise acknowledges that, "by the time of trial, the plaintiff ought to provide the most particularized description that is appropriate to the nature of the secret." James Pooley, Trade Secrets § 11.02 (2025).[2]

Many other publications acknowledge that a plaintiff must present sufficient evidence identifying its alleged trade secrets to survive summary judgment or succeed at trial. *See, e.g.*, 4 Milgrim on Trade Secrets § 14.02[0.1][a][i] (2025) (identifying alleged trade secrets with "particularity is needed because the trier of fact might not have the expertise to concretely identify the trade secret at issue or evaluate its status as a trade secret"); Jager, et al., 2 Trade Secrets Law § 22:16 (2024) ("When properly challenged on summary judgment, a trade secret is to be identified with particularity so as to show a genuine issue

---

[2] The other publication Zunum cites (*see* AOB 24) does not support Zunum's position either. To the contrary, it notes that "a plaintiff's failure to satisfy the particularity requirement can provide a basis to grant summary judgment to the defendant." Peter S. Menell, et al., *Trade Secret Case Management Judicial Guide* § 7.3.1.2 (2023).

of material fact, which is different from the discovery-based purposes [of trade secret identification.]"); 1 Mills, et al., Patent Law Fundamentals § 4.9 (2d ed.) (noting that a plaintiff must identify its alleged trade secrets with particularity to survive summary judgment or to prevail at trial (collecting cases)).

And while Zunum and its *amicus* contend that trade secrets need not be identified with the same level of specificity as a patent disclosure, neither Boeing nor the district court ever suggested otherwise. Rather, a plaintiff must identify its alleged trade secrets with enough detail to enable the trier of fact to separate them from matters of general knowledge. *See InteliClear*, 978 F.3d at 658. This is not the same as patent law's disclosure requirement, and Zunum's and its *amicus*'s attempt to conflate the two is a red herring.

At bottom, the requirement that a plaintiff must identify the information it claims to be a trade secret at trial is eminently sensible: without it, it would be impossible for the trier of fact to rule on the most fundamental elements of the plaintiff's claim (whether the alleged secret differed from matters of general knowledge, whether it was misappropriated, and how any misappropriation caused damages). *See id*. The district court thus correctly required Zunum to present

- 23 -

evidence identifying its ATS with sufficient particularity. As explained below, Zunum's evidence fell far short of establishing this element—and the other elements of its misappropriation claim.

> ## 2. *Zunum failed to prove each element of its misappropriation claim.*

As plaintiff, Zunum bore the "burden of proving" the elements of its misappropriation claim as to each ATS. *Ed Nowogroski*, 971 P.2d at 942. On a secret-by-secret basis, Zunum had to (i) identify the information at issue, (ii) prove that the information was not "generally known" or "readily ascertainable" and that it "[d]erive[d] independent economic value" from being secret, and (iii) show that Boeing misused the information. Wash. Rev. Code § 19.108.010(4).

Zunum needed to establish these elements through admissible, competent evidence, not mere "threadbare conclusory statement[s]." *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802 (9th Cir. 2009). Yet Zunum allocated very little of its case-in-chief to that end—on average, only six minutes of expert testimony per ATS, with most of that addressing ATS on which Boeing *prevailed* at trial. 1-ER-12-13 (noting that Zunum devoted only 42 minutes of expert testimony to ATS 1-6 and 20, the same for ATS 7-13, and only 33 minutes on ATS 15-19).

- 24 -

For the ATS on which the jury found for Zunum, the record was vanishingly thin. That record was insufficient to support the resulting verdict.

   a) ATS 1

*First*, Zunum failed to present evidence identifying the contents of ATS 1 with sufficient particularity. Zunum argues that testimony by its cofounder and one of its expert witnesses about ATS 1 was sufficient. AOB 26-27. Not so. Despite ATS 1 purportedly consisting of "design requirements and objectives for hybrid-electric aircraft relating to" several categories of information (AOB 26), Zunum's cofounder relied on a single slide during his testimony, which reflected only a "subset" of those design requirements. 1-ER-19. Zunum's cofounder identified no other document and offered no other testimony to substantiate the bounds of ATS 1. The testimony of Zunum's expert was similarly deficient. He, too, identified just one slide that did not reflect all the design requirements supposedly encompassed within ATS 1. 14-ER-3173-74. Because the jury was left to guess at what the "design requirements" comprising ATS 1 were, Zunum failed to sufficiently define its contours. *InteliClear*, 978 F.3d at 658.

*Second*, a single line of conclusory testimony by Zunum's expert that ATS 1 was "novel, valuable, [and] kept secret"—nothing more—is not substantial evidence that could sustain the verdict. 14-ER-3173; *Lakeside-Scott*, 556 F.3d at 802. That is particularly so when the evidence showed that much of the information Zunum presented as part of ATS 1 was publicly available. *See* 14-ER-3191-3197.

*Third*, Zunum did not present substantial evidence that Boeing used ATS 1. In fact, the only evidence of use Zunum presented concerned "design requirements" that were public at the time of the alleged use. *Id.*; 14-ER-3173-74.

> b) ATS 2, 5, and 6

*First*, Zunum failed to present evidence explaining what information it claimed to constitute ATS 2, 5, and 6. Zunum argues that one of the demonstratives the district court included with its jury instructions—Exhibit 2000—defined these ATS. AOB 27. But as the district court properly instructed the jury on the first day of trial (without objection from Zunum), Exhibit 2000 was a demonstrative to help the jury understand Zunum's claims; it was not evidence and could not be considered by the jury to establish that Zunum actually

- 26 -

"possessed the information discussed therein, [or] that any information therein constitutes a trade secret."[3]  11-ER-2495-96.

Zunum next points to testimony by its cofounder and an expert, arguing that they sufficiently identified these ATS.  AOB 27.  Once again, that testimony identified only a handful of slides that do not reflect all these ATS's contents.  11-ER-2518-20; 14-ER-3174, 3177-80. Zunum presented no other evidence explaining what information fell within the bounds of each.

*Second*, Zunum presented just a single line of conclusory testimony by its expert that these ATS were novel, valuable, and kept secret.  14-ER-3173.  As discussed earlier, such conclusory testimony could not carry Zunum's burden.  *Lakeside-Scott*, 556 F.3d at 802.

*Third*, Zunum failed to present substantial evidence of use of these ATS.  Indeed, no evidence showed any "use" of anything "secret." *See* 14-ER-3201-02, 3209-10.

> c)   ATS 7

*First,* Zunum did not present substantial evidence identifying ATS 7.  Mr. Knapp testified that a single slide "related to [ATS] 7," but failed

---

[3] Zunum's arguments relying on Exhibit 2000 relating to its other ATS fail for the same reason.  *See, e.g.,* AOB 27.

to explain how.  *See* 11-ER-2591; 6-ER-1435.  Zunum's expert vaguely described ATS 7 as "a megawatt class hybrid powertrain system" while pointing to a slide with high-level information.  *See* 14-ER-3282; 5-ER-956.  This generic description does not explain how ATS 7 differs from matters of general knowledge.  Indeed, the expert admitted that "anybody knowledgeable in the art would be able to come up with the idea of designing a one-megawatt powertrain," and that generally Zunum's was "not unique technology."  14-ER-3301-03.

*Second*, Zunum failed to present substantial evidence of novelty.  Zunum's expert testified in conclusory fashion that ATS 7 was "novel" because he saw no one else "with this class of airplane" developing this type of powertrain "for commercial use, in the early to mid [20]20s."  14-ER-3282.  But he admitted that "anybody knowledgeable in the art would be able to come up with" this idea, 14-ER-3301-02, and Zunum disclosed information about its powertrain publicly.  1-ER-29-30.

*Third*, Zunum did not present substantial evidence that Boeing used ATS 7.  Zunum's only evidence was its expert's conclusory testimony that "Boeing used it certainly as a benchmark to do all the studies for the Thin Haul" Study, that Boeing used Zunum's "battery roadmap" in the Electric Lab, and that Boeing discussed using a "range

- 28 -

extender" for a project called SECA. 14-ER-3285, 3287-89. But he did not identify any particular information that Boeing used during the Thin Haul Study, and his testimony regarding use of a "battery roadmap" (a term unexplained to the jury) was conclusory. 14-ER-3287-88 ("Q: What did you conclude as to whether or not Boeing was benefitting from [Alleged] Trade Secret No. 7 in its electric lab program? A: Just by what I said here, briefly, okay. There are many aspects of it. And as you discuss, and so on, you learn what you need and you work towards it."). As to SECA, Zunum's expert failed to explain how ATS 7 relates to the idea of a "range extender" (which is separately defined as ATS 11).

### d) ATS 9

*First*, Zunum did not present substantial evidence identifying ATS 9 with particularity. The sole evidence Zunum presented was its expert's testimony that ATS 9 was "the hybrid powertrain system controller," without explaining how the system controller worked, how it was separate from matters of general knowledge, or why it was unique to Zunum. 14-ER-3291-92 (expert conceding he presented only a "high-level representation" of ATS 9); *id.* at 3300-01 (expert disagreeing

"that Zunum had unique technology"). This is insufficient. *InteliClear*, 978 F.3d at 658.

*Second*, Zunum also did not present substantial evidence of ATS 9's novelty. Zunum offered just one line of testimony from its expert that this ATS was "novel" and "derived value from being kept secret." 14-ER-3297. This conclusory testimony is insufficient to carry Zunum's burden. *See Lakeside-Scott*, 556 F.3d at 802. At any rate, Zunum's expert admitted that "the idea of having a system controller that would monitor and control the powertrain"—ATS 9—was "not unique to Zunum." 14-ER-3316.

*Third*, Zunum did not present substantial evidence that Boeing used ATS 9. Zunum's sole evidence of use is its expert's testimony that he looked at unidentified "Boeing statements." 14-ER-3292. Yet that testimony is largely incoherent, 14-ER-3292-93, and the documents he was trying to describe were never admitted into evidence.

e) ATS 10

*First*, Zunum did not present substantial evidence identifying ATS 10. Zunum's "evidence" consisted of its expert's testimony that ATS 10 was "the motor controller system" and "the development of the various components in there." 14-ER-3294-95. But the expert did not describe

- 30 -

any of those "components" or explain how (or if) they were unique to Zunum. *See InteliClear*, 978 F.3d at 658.

*Second*, Zunum failed to show that ATS 10 was novel. Zunum relied on the same, single line of conclusory testimony for ATS 10 as it did for ATS 9, which is insufficient. 14-ER-3297; *see Lakeside-Scott*, 556 F.3d at 802. That is all the more true because Zunum's Chief Technology Officer admitted that the "features of Zunum's motor controller"—ATS 10—"weren't unique to Zunum." 14-ER-3316.

*Third*, Zunum presented no evidence at all regarding Boeing's alleged use of ATS 10. Zunum's sole evidence addressing ATS 10—its expert's testimony—does not mention any alleged use (or Boeing). 14-ER-3294-95.

> f)    ATS 11

*First*, Zunum did not present substantial evidence identifying ATS 11. Mr. Knapp identified one picture of a "turbo generator" on one PowerPoint slide that related to ATS 11. 11-ER-2554. Mr. Knapp provided no other explanation of what the "turbo generator" was, let alone how it related to ATS 11. *Id.* Zunum's expert testified only that ATS 11 was a "[h]ybrid powertrain range extender" that includes "the way that Zunum developed it and the application of this, within the

- 31 -

entire system." 14-ER-3295. Yet he never explained how Zunum "developed" the range extender, its intended application, or the "system" to which it would be applied. *Id.*

*Second*, Zunum failed to present substantial evidence that ATS 11 was novel. Zunum again relied on just a single line of conclusory testimony from its expert, which is insufficient. 14-ER-3297; *see Lakeside-Scott*, 556 F.3d at 802. The expert also admitted that Zunum's "range extender"—ATS 11—is "not a new concept." 14-ER-3295; *see also* 14-ER-3318.

*Third*, Zunum failed to establish that Boeing used ATS 11. Its only evidence of purported use of this ATS was expert testimony that Boeing discussed "updat[ing] the SECA program to . . . include a range extender." 14-ER-3288-89, 3295. As noted above, a "range extender" is not a novel concept, and no evidence shows that Boeing ever used one. This speculative testimony cannot establish misappropriation.

g)   ATS 12

*First*, Zunum failed to identify ATS 12, which purportedly consists of a "multi-step method to 'flow down' the overarching requirements for a hybrid-electric aircraft to identify the specific requirements for each of the aircraft's lower-level systems." 7-ER-1560. No Zunum witness

described this "method"—nor even any "step." Mr. Knapp testified only that Zunum "had to develop this method, to address" a "shortcoming" in "classical flow-down analysis" (another unexplained term). 11-ER-2511-2512. Zunum's expert similarly never described the method, stating only that ATS 12 was "how you flow those requirements, how you divide them so the engineers can actually go and work on them, more specifically." 14-ER-3296. These generic statements do not explain what ATS 12 is. *See InteliClear*, 978 F.3d at 658.

*Second*, Zunum failed to present substantial evidence that ATS 12 was novel. Zunum relied on just a single line of conclusory testimony by its expert, which cannot carry its burden. 14-ER-3297; *see Lakeside-Scott*, 556 F.3d at 802.

*Third*, Zunum did not present substantial evidence that Boeing used ATS 12. Zunum's only evidence was the expert's assertion that Boeing "used" Zunum's information "as a starting point for the study of the Thin Haul." 14-ER-3297. But no witness—expert or otherwise—identified what information Boeing used this way. In fact, Zunum's expert admitted that "without [Zunum's] APAC software, someone would need to use a different method than" ATS 12, and it is undisputed that Boeing never had access to Zunum's APAC software (as

the jury also concluded). 12-ER-2734-35; 14-ER-3320; 9-ER-2133 (jury finding Boeing did not misappropriate ATS 3 (APAC)).

> h)    ATS 13

*First*, Zunum did not present substantial evidence identifying ATS 13, which supposedly consists of the "specific requirements for key subsystems and components of the powertrain." 7-ER-1560. The sole evidence Zunum offered was a single sentence of expert testimony that ATS "13 is actually a set of those requirements that the engineers will work on to be able to design the airplane." 14-ER-3296. Neither he nor anyone else articulated any of those "requirements."

*Second*, Zunum failed to present substantial evidence that ATS 13 was novel. Zunum once again relied on nothing but a single line of conclusory expert testimony, which is insufficient. 14-ER-3297; *see Lakeside-Scott*, 556 F.3d at 802.

*Third*, Zunum did not present substantial evidence that Boeing used ATS 13. Because Zunum did not identify even a single hybrid powertrain "requirement," it also failed to identify any "requirement" that Boeing used. Zunum's expert testified that Boeing used Zunum's information "as a starting point" for the Thin Haul Study. 14-ER-3297. But he never identified any portion of ATS 13 used this way.

- 34 -

i)      ATS 19

*First*, Zunum failed to present substantial evidence identifying ATS 19, which purportedly consisted of a "commercialization plan."  1-ER-38.  Zunum once again pointed to only a few slides, which reflected only "part of the commercialization plan."  *Id*.  But Zunum never presented any other evidence reflecting the rest.

*Second*, Zunum failed to present substantial evidence that ATS 19 was novel or valuable.  Zunum's expert opined that it was, but he never explained how Zunum's commercialization plan derived value from being secret, particularly when parts of the plan were public.  16-ER-3678, 3707-09.

*Third*, Zunum did not present substantial evidence of use.  Indeed, Boeing has never developed or commercialized a hybrid-electric aircraft, and Zunum presented no evidence pointing to any purported use of its "commercialization plan."  *See id*.

3.    *The district court properly applied the standard under FRCP 50.*

Ignoring these deficiencies, Zunum argues that the district court misapplied Rule 50 by (i) dismissing Zunum's experts' opinions; (ii) ignoring "additional relevant evidence"; and (iii) disregarding the

- 35 -

Supreme Court's guidance in *Reeves*. AOB 31-37. All three arguments fail.

*First*, the district court correctly held that Zunum's expert testimony did not constitute substantial evidence to support the verdict. Zunum suggests that the district court "made credibility and weight determinations" when considering expert testimony. AOB 31. Not so. The district court accepted the experts' testimony as true statements of opinion and determined that, even so, that testimony was too insubstantial to support the verdict. *See, e.g.*, 1-ER-20-22. That distinguishes the sole case Zunum cites, where the district court credited the defense expert's testimony over the testimony of the plaintiff's expert. *See Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1110-1111 (9th Cir. 2013) (noting the district court's comments that "the defense expert 'pretty much just blew away these two pathologists called by [the plaintiff]'" (cleaned up)). The district court here made no such credibility determinations.

Zunum also faults the district court for finding the testimony of Zunum's expert's "conclusory," arguing that Federal Rule of Evidence 705 permits conclusory testimony. AOB 31-32. But Rule 705 concerns the *admissibility* of expert testimony at trial, not the sufficiency of

- 36 -

evidence under FRCP 50. *See, e.g., Weigel v. Target Stores*, 122 F.3d 461, 468-69 (7th Cir. 1997) (Rule 705 "speaks to admissibility" and "[not] how much weight should be accorded to the evidence"); *Ambrosini v. Labarraque*, 966 F.2d 1464, 1470 (D.C. Cir. 1992) (noting that "the issue of admissibility of an expert's opinion under Rules 703 and 705 is separate and distinct from the issue whether the testimony is sufficient"); *see also United States v. Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir. 1981) (rejecting argument that expert opinions admissible under Rule 705 were "in themselves sufficient").

The only relevant inquiry is the sufficiency of Zunum's experts' testimony, not its admissibility. A party cannot defeat a Rule 50 motion by pointing to "threadbare conclusory statements," such as those offered by Zunum's experts; it must instead identify "significant probative evidence" supporting its claims. *Lakeside-Scott*, 556 F.3d at 802; *see also Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008) ("Conclusory statements without factual support are insufficient to defeat a motion for" JMOL). The district court applied the correct standard and found Zunum's experts' conclusory testimony insufficient.

*Second*, none of the evidence Zunum claims the district court disregarded compels a different outcome.

- 37 -

Zunum contends the district court ignored evidence of "the effort and expense that was expended into developing" the ATS. AOB 34. But this evidence has nothing to do with *what* Zunum's ATS are. Indeed, even Zunum did not cite this information as purported evidence of the existence of its trade secrets. 2-ER-206-236. And Zunum's witnesses admitted that the evidence of Zunum's development expenditures was at best inaccurate and at worst fashioned from whole cloth. Mr. Knapp admitted that he calculated the alleged expenditures years after the fact, without any time records or even talking to the employees who purportedly developed the ATS. 12-ER-2744-45. Zunum's damages expert admitted he "didn't . . . independently verify" Zunum's post-hoc recreation of the expenditures. 16-ER-3789. And the evidence demonstrated that Zunum's claimed expenditures were in fact incorrect. 12-ER-2748 (Mr. Knapp conceding that he got alleged labor costs and "estimates of time . . . wrong").

Zunum also says the district court ignored evidence of the amount Boeing paid to access Zunum's intellectual property. AOB 34. But Zunum did not cite this information as purported evidence of the *existence* of its purported secrets to the district court, nor would such evidence indicate whether the ATS existed. *See* 2-ER-206-236.

- 38 -

Further, the evidence at trial showed that Boeing made only a modest investment of $9 million in Zunum, which "in the grand scheme of an airplane design process . . . [was] very little," 13-ER-2972, and then ceased investing further when it determined there was a "high degree of skepticism that the claims [Zunum was] making didn't hold water." 17-ER-3947.

Zunum further argues that the district court ignored "Zunum experts discussing demonstratives." AOB 35. But demonstratives are not evidence. *See* 14-ER-3154 (district court instructing the jury (without objection by Zunum) that "[d]emonstratives are not evidence"); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 773 n.9 (9th Cir. 1981) ("The admissibility of demonstrative evidence in particular is largely within the discretion of the trial judge."). The district court addressed the testimony of Zunum's experts in its order granting JMOL concluding that it was insufficient "to properly identify [the ATS] or provide non-conclusory testimony that [the ATS] derived value from not being generally known . . . or readily ascertainable." 1-ER-19-41.

*Third*, the district court did not "reverse[] *Reeves'* instructions." AOB 36. Although district courts should credit the evidence favoring the nonmovant, "the court should give credence to the . . . evidence

- 39 -

supporting the moving party that is uncontradicted and unimpeached."
*Reeves*, 530 U.S. at 151 (citation omitted). *Reeves* does not require a
blind acceptance of conclusory expert testimony reciting the elements—
such as that the ATS were "novel" and "valuable"—particularly where
other, unchallenged evidence contradicts this conclusory testimony.
Rather, *Reeves* requires the district court to draw reasonable inferences
in the non-movant's favor, while also accepting as true uncontradicted
evidence favorable to the movant. *Id.* The district court here did just
that.

B.  <u>Boeing was entitled to JMOL on Zunum's claim for breach of
the IRL.</u>

1.  *Zunum failed to present evidence that it disclosed
confidential information to Boeing under the IRL.*

The IRL governs confidential information disclosed to Boeing
between March 2017 and May 2018. *See* 6-ER-1214 (IRL); 9-ER-2188
(parties signed a new IRL in May 2018). Zunum claimed that the only
confidential information that Boeing misused under the IRL was its
ATS. 9-ER-2098 ("The theory of misappropriation is that in breach of
the contract, they used the trade secrets.").

Yet the only information Zunum presented relating to the ATS that was disclosed while the IRL governed was two slides from Zunum's presentations. Zunum's cofounder testified that (i) a slide from a presentation Zunum disclosed to Boeing in December 2017 reflects some unidentified portion of ATS 11; and (ii) a slide from a presentation disclosed in July 2017 reflects some unidentified portion of ATS 19. 11-ER-2555, 2541-42.

Uncontradicted evidence showed that these two slides contained only public information and thus were not confidential. One of the slides depicts a series of images that purportedly pertain to ATS 11, with Mr. Knapp testifying that the relevant image was a "generic picture" of a "range extender." *Id.* at 2555. And Zunum's expert also testified that the "[h]ybrid powertrain range extender" was itself "not a new concept." 14-ER-3295. As for the other slide, no witness ever testified that the information contained on it was confidential. In fact, Zunum's expert admitted that the features of Zunum's commercialization plan that he had identified on the slide were "public." 16-ER-3706-09.

2. *Zunum failed to present evidence that Boeing misused any information disclosed under the IRL.*

Even if the information disclosed to Boeing under the IRL were not confined to the two slides discussed above, Zunum failed to present evidence that any confidential information was misused by Boeing. Zunum claims that Boeing misused Zunum's information in "four programs." AOB 39-49. The trial record shows the opposite.

a) Boeing's "Competitive Assessment"

Zunum first argues that its confidential information was misused in a Boeing slide deck as part of a purported "competitive assessment" of Zunum. AOB 39-42. This argument fails.

*First*, there is no evidence that the slide deck used any Zunum information. Zunum speculates that such use occurred because the author of the deck supposedly attended a meeting with Zunum. AOB 40-41. But there is no evidence that the information presented at the meeting—or any Zunum information at all—was ever used in the "competitive assessment" deck or that the author's alleged attendance of that meeting otherwise resulted in any misuse of Zunum information. 1-ER-44-46. Zunum cites no such evidence in this appeal.

- 42 -

*Second*, Zunum presented no evidence that any purported use of Zunum's information to conduct a "competitive assessment" constituted an unauthorized use under the IRL. That the slide deck contains the phrase "Data Acquisition" and "referenc[es] Zunum" does not raise a reasonable inference that Boeing was doing anything more than evaluating Zunum's capability—a sensible way of assessing Boeing's investment in Zunum, which was authorized under the IRL. 1-ER-46. Indeed, the very documents on which Zunum relies refer to Boeing being "asked to help evaluate the Zunum hybrid-electric airplane concept." 6-ER-1236; *see also* 6-ER-1266 (slide deck references meeting as "Data sharing/Eval"); 7-ER-1577-79 (Boeing spreadsheet calling Zunum's "performance claims . . . very risky").

Zunum argues that because the presentation "discussed just one other company—Airbus, Boeing's principal competitor," AOB 40, it was competitive, not evaluative, and therefore improper. But Zunum does not explain why. Indeed, the cover email transmitting the presentation contradicts this inference, stating that the presentation was "to understand what Boeing collectively has in the way of an airplane definition to form the basis of the evaluation." 6-ER-1236. Zunum's

attempt to create an inference of impropriety based on the deck's mention of Airbus is speculation.

*Third*, the trial evidence demonstrates that the deck contained only public information. Two of the five Zunum-related slides in the presentation expressly quote or summarize information from public news articles. 6-ER-1268, 1271. Zunum argues that this deck contains Zunum "specifications," but trial evidence showed that this information was also publicly available. 14-ER-3191-97.

### b) Thin Haul Study

Zunum next argues that "direct evidence" shows that Boeing misused confidential information in "Boeing's copycat program (thin haul)." AOB 42. But Zunum did not establish that the Thin Haul Study was conducted for any purpose other than assessing Zunum's claims (permissible under the IRL). Zunum rehashes three arguments, all of which either mischaracterize the evidence or require speculation:

**Timing of the study**. Zunum asserts that the Thin Haul Study was launched "after [Boeing's] investment" in Zunum to support its speculative inference that Boeing had no further need to evaluate its investment in Zunum at the time of the study. AOB 43. This misstates the record, which established that Boeing had initially loaned only a

- 44 -

modest amount, and that both parties knew that Boeing was conducting further diligence ahead of a potentially much larger future investment. 13-ER-2972 ($9 million investment was "in the grand scheme of an airplane design process . . . very little"); 17-ER-3947 (Boeing had a "high degree of skepticism that the claims [Zunum was] making didn't hold water"); *see also* 15-ER-3492 (Dr. Kumar admitting he was aware of Boeing's internal study months before it concluded).

**Statements by Pradeep Fernandes**.  Zunum argues that certain statements by Boeing employee Pradeep Fernandes support the inference that Boeing was considering its own program to develop an airplane—while ignoring the undisputed evidence that Boeing never initiated an aircraft development program relating to hybrid-electric aircraft, much less one that used Zunum's confidential information.  *See* 13-ER-3011.

In any event, Zunum takes Mr. Fernandes's statements out of context.  For example, Zunum says that Mr. Fernandes testified that he was "working very closely with some individuals to kick off a[n] electric-hybrid airplane concept from scratch," 13-ER-2899, but omits his subsequent testimony that these statements were "a reference to a Thin Haul [S]tudy, which we were running to see what partnership options

- 45 -

we were running with Zunum." 13-ER-2901. Every witness who participated in the Thin Haul Study testified that it was an evaluative study. *See* 13-ER-2892; 13-ER-3096; 14-ER-3255. Zunum presented no evidence to support its theory that the Thin Haul Study was in fact a program involving the misuse of Zunum's information. *See* 15-ER-3508 (Dr. Kumar admitting he wrote that the Thin Haul Study resulted in a "very different" aircraft than Zunum's design).

**The Spreadsheet**. Zunum argues that a Boeing spreadsheet showed that Boeing was developing a competing program based on Zunum's confidential information. The spreadsheet, and the email to which it is attached, show that Boeing was comparing its conceptual study against Zunum's claims to evaluate those claims. 7-ER-1577. The spreadsheet concludes that there were several "concerns about Zunum's concept." 7-ER-1577 (describing "Conclusions," including that "Zunum's concept is based on very aggressive technology assumptions" and "Zunum's performance claims, while not implausible, are very risky"). Zunum points to nothing in the spreadsheet suggesting that Boeing used any Zunum information.

c)      Electric Lab

Zunum argues that there was sufficient evidence of use of Zunum's confidential information in Boeing's Electric Lab ("E-Lab") for two reasons: (i) Zunum's expert's conclusory testimony that he saw evidence of use in the E-Lab; and (ii) evidence that Zunum's "confidences" were purportedly used to propose a partnership with Safran.  The district court correctly found that Zunum presented no evidence that its confidential information was used in the E-Lab.

*First*, Zunum argues that the district court improperly "disregarded" evidence of "similarities between Boeing's E-Lab and Zunum's confidences, including its battery roadmap, copper-bird plans, and one-megawatt hybrid configuration with plans to integrate a third-party motor controller."  AOB 47.  But Zunum cites only Zunum's expert's testimony stating that: (1) he "understand[s] that Zunum shared with Boeing their battery roadmap" and that a battery would be a "key capability" to incorporate into the E-Lab, 14-ER-3286-88; and (2) incorporating the one-megawatt engine would require the E-Lab to "upgrade . . . to account for much higher power."  14-ER-3324-25.  The district court addressed this testimony, which not only was conclusory but failed to establish that any information used was confidential.  1-

ER-50-51. And Zunum's expert did not testify (even in conclusory fashion) that any similarities existed between the E-Lab and Zunum's copper-bird plans. 14-ER-3286-87 (testifying only that these terms are "use[d] frequently" by developers, not that he saw evidence of use).

*Second*, Zunum argues that the district court discounted evidence that Boeing, "through E-Lab, used Zunum confidences to pitch Zunum's prospective partners." AOB 46. The "Zunum confidences" that Boeing supposedly used were in a "propos[al]" to "partner with Safran on hybrid-electric technologies and an engine similar to Zunum's." *Id.* at 47. But the record contains no evidence that Boeing's communications with Safran had anything to do with. 6-ER-1209 (email mentioning meeting with Safran); 6-ER-1344 (email mentioning meeting with Safran); 4-ER-3328-29 (Boeing employee Dr. Karimi testifying that Safran was one of "many suppliers" that he engaged with). Indeed, the evidence demonstrates that any "partnership" with Safran resulted from Safran responding to a request for information, contradicting Zunum's theory that Boeing misused its information to secure that partnership. 4-ER-3338. The only other evidence Zunum cites consists of self-serving, speculative, and conclusory testimony by Dr. Kumar. 15-ER-3397 (testifying that "[i]t was clear to me that Boeing had been

- 48 -

running off with the engine majors to go develop a competing hybrid aircraft"). Dr. Kumar's testimony also relates to information disclosed under the PIA, which Boeing did not breach. 6-ER-1228; 9-ER-2131-40.

> d) Electra

Zunum argues that "given Boeing's aggressive misuse of Zunum's IP, a jury could infer that some Zunum confidences made their way to Electra"—a third-party company in which Boeing considered (but declined) an investment, and from which Zunum offered no witnesses and took no discovery in this case. AOB 49; 15-ER-3621. Zunum makes four arguments, none of which supports this inference.

*First*, Zunum points to statements that Electra was intended to "replace Zunum," omitting the context that a Boeing executive was considering ways to "replace Zunum" in the "Boeing NeXt portfolio"[4]— and that no agreement nor investment was ever reached. 15-ER-3594, 3621.

*Second*, Zunum points to a statement that Electra was "buil[t] on excellent work," but does not identify any "work" that was related to or derived from Zunum confidential information. 15-ER-3598. Again,

---

[4] Boeing NeXt was an internal Boeing initiative to explore innovative and undeveloped aviation technologies.

Zunum's failure to take discovery from Electra to discern what "work" it may ultimately have completed left a striking hole in the speculative case that Zunum presented to the jury.

*Third*, Zunum points to the request by Electra's founder for "indemnification . . . against any claims from Zunum." AOB 48. But Boeing never agreed to that request, and a request *from Electra* does not show that *Boeing* "felt it necessary to 'insure' against the contingency that [it] might be found to have stolen" alleged trade secrets, nor a "subjective belief that an act already taken" was wrongful. *DSC Commc'ns Corp. v. Next Level Commc'ns*, 929 F. Supp. 239, 244 (E.D. Tex. 1996).

*Fourth*, Zunum argues that a Boeing executive's proposal that Electra "[i]nvestigate Zunum IP" permits the inference that Boeing did, in fact, investigate Zunum's IP for use in Electra. But "Zunum fails to mention that this 'investigation' was part of a future 'Timeline' that first required Boeing and Electra to sign a memorandum of understanding." 1-ER-52. Unrefuted evidence demonstrates that Boeing and Electra never signed an MOU, and Boeing did not invest in Electra. 7-ER-1555; 15-ER-3621. Accordingly, the evidence refutes that Boeing ever "[i]nvestigate[d] Zunum's IP" for use in Electra.

- 50 -

### 3. *Zunum failed to present sufficient evidence of harm from alleged breach of the IRL.*

Boeing is entitled to JMOL for another independent reason: Zunum failed to present substantial evidence of any harm resulting from Boeing's alleged breach of the IRL. Indeed, no evidence establishes that Zunum experienced any harm, let alone in the amount of $67.08 million the jury awarded on this claim, which represents the supposed destruction of Zunum's company value. As the district court explained, Zunum's theory of harm "rests on a series of preposterous logical inferences rather than fact or evidence." 1-ER-53.

*First*, Zunum argues that Boeing "us[ed] Zunum confidences on competing programs and shop[ped] them to the market" when Dr. Karimi met with Safran to discuss building a 500-kilowatt motor for the E-Lab. AOB 50. That Dr. Karimi scheduled meetings with Safran the same day that Safran met with Zunum says nothing about whether Boeing was advancing competing programs using Zunum's information. 1-ER-48.

Zunum theorizes that such meetings caused "confusion" for Safran and undermined Zunum's ability to secure funding from Safran. Zunum cannot corroborate this speculation about a third-party

aerospace conglomerate's mental state and did not elicit testimony from *any* Safran employee. This theory also fails for the same reasons as Zunum's tortious-interference claim. *Infra* § I.C; AOB 50. But even if the Court were to credit this testimony, it does not establish that "confusion" was caused by the alleged misuse of information disclosed under the IRL. Because Zunum's alleged harm was never tied to Boeing's alleged misconduct, the sole case Zunum cites—*eCommerce Indus., Inc. v. MWA Intel., Inc.*—is inapt: Zunum has not demonstrated that any "decreased negotiating position" was a result of Boeing's purported breach of the IRL. 2013 WL 5621678, at *19 (Del. Ch. Sept. 30, 2013) (finding evidence that disclosure of a specific confidential term from a prior agreement resulted in "decreased negotiating position").

*Second*, Zunum points to a Boeing email stating: "Safran Ventures unlikely to close round due to concerns that its investment would be seen as a negative to Boeing." 6-ER-1353. Zunum presents no evidence connecting Safran's concerns to any Boeing action. To the contrary, the evidence demonstrated that Boeing attempted to support a Safran investment and that the deal stalled for reasons unrelated to Boeing. *See infra* § I.C. In any case, Zunum must establish that

Safran-related harms were caused by Boeing's misuse of Zunum's confidential information under the IRL—which it has not done.

*Third*, Zunum again tries to connect its failure to Electra's success. This argument lacks merit for the reasons described in section I.B.2.d., *supra*. Zunum attempts to bolster this theory with Mr. Knapp's testimony that Electra's success "should have been [Zunum's]." AOB 62 (citing 11-ER-2603). But again, Zunum's speculation that it could have succeeded in Electra's place says nothing about any use of IRL-protected information by Boeing or how any purported use harmed Zunum.

*Fourth*, Zunum argues that "the evidence showed Zunum was worth $163 million in March 2018" and "essentially zero" after November 2018. AOB 62. For the reasons discussed in section I.D, Zunum's damages theory fails. But even if Zunum had a credible damages theory, Zunum has no evidence connecting this alleged destruction in value to misuse of information under the IRL.

C.  <u>Boeing was entitled to JMOL on Zunum's claim for tortious interference.</u>

1.  *The evidence failed to establish that Zunum had a reasonable business expectancy with Safran.*

To succeed on its claim for tortious interference, Zunum first needed to present evidence that it had a reasonable business expectancy with Safran rather than "wishful thinking."  1-ER-55-59; *Greensun Grp., LLC v. City of Bellevue*, 7 Wash. App. 2d 754, 769 (2019).  Zunum failed to do so.  Indeed, Zunum ignores the undisputed evidence cited by the district court—from Zunum's own founders—which showed that Zunum and Safran were miles apart on material terms in October 2018, when Safran declined to invest in Zunum:

- Dr. Kumar admitted that in September 2018, Safran was "quite concerned" with Zunum's proposed valuation ($160 to $220 million).  8-ER-1899.

- Dr. Kumar admitted that Safran's proposed valuation in September-October 2018 equated to $40 million, which he considered "poor by any metric."  8-ER-1900-02, 1903.

- Zunum "countered with a proposal" of an $89 million valuation in early October 2018 (shortly before Safran

declined to invest). 8-ER-1887. But Safran never agreed. In January 2019, Dr. Kumar wrote that Safran remained at a $40 million valuation: "Safran at 40 million is daylight robbery." 8-ER-1902.

Evidence also established that whatever Safran was offering in September 2018 was unacceptable to Zunum:

- Mr. Knapp called Safran's proposed terms "pretty egregious" and wrote: "if we don't get better terms out of Safran this week we're going to have to ramp down." 12-ER-2778-79.

- Dr. Kumar admitted believing that "Safran's mid-September proposed terms were not made in good faith," and that given his "issues with Safran's proposal [Zunum] decided to focus on generating alternatives to Safran financing." 8-ER-1912-13.

Zunum also conflates the elements of its tortious-interference claim by referencing alleged acts of interference—that Boeing allegedly "spoke to Safran" and was "courting Safran"—that do not relate to the first element, whether a valid business expectancy existed. AOB 54-55. Because these purported "acts" are irrelevant to that element, the district court rightly disregarded them.

- 55 -

Zunum cites *Scymanski v. Dufault*, 80 Wash. 2d 77, 85 (1971), for the proposition that there was a "reasonable expectation of fruition." But in the potential transaction at issue in that case, "[a]ll that remained to be done to complete their transaction was the execution of the lease agreement, which the attorney was preparing at the instruction of the parties." *Id.*[5] This points to another striking hole in Zunum's evidence: no definitive documentation, drafts, or even term sheet for a deal with Safran was offered into evidence.

2.  *The evidence at trial failed to establish the other elements of Zunum's tortious-interference claim.*

This Court may also affirm the judgment based on Zunum's independent failure to present substantial evidence establishing the other elements of its tortious-interference claim, which the district court did not need to reach. 1-ER-59; *see Surfvivor Media*, 406 F.3d at 630.

---

[5] Zunum also cites *Wall v. Olympic Vista Development*, 2004 WL 1557311, at *4 (Wash. Ct. App. Mar. 2, 2004). *Wall* is inapt because it concerned a simple residential transaction that was reasonably probable to close, as opposed to a complex investment deal in unproven technology where the parties' negotiations placed them miles apart. *See id. Wall* is also unpublished and thus has "no precedential value." Wash. Gen. Rule 14.1(a), (c).

a) "Intentional" Interference

Zunum failed to introduce evidence that Boeing "intentional[ly] interfere[d][,] inducing or causing termination of the expectancy." *Greensun*, 7 Wash. App. 2d at 768 (cleaned up). The sole evidence Zunum relied on to establish this element consists of three internal Boeing documents, which do not support the notion that any interference occurred. *See* 9-ER-2106-08.

- In a January 2018 email, Mr. Fernandes wrote to Steve Nordlund: "Would also help to give Greg [Hyslop] a heads up that our (Boeing) words and actions have already set Zunum back from Safran investment perspective." 6-ER-1231. But Boeing "words and actions" in January 2018 cannot have interfered with a deal that was negotiated for the next ten months, and Zunum presented no evidence connecting this email to Safran's decision not to invest almost a year later.

- Zunum contended that an internal September 2018 email from Mr. Nordlund stating: "What leverage do we have on the Safran deal, if we don't like it let's use the leverage," 6-ER-1346, meant "driv[ing] a wedge between Zunum and Safran." 9-ER-2107. But Mr. Nordlund testified that Boeing, like Zunum, believed Safran's

- 57 -

terms were "aggressive," and Boeing was considering how to "make it a good deal" for Zunum. 8-ER-1924-25. Zunum presented no contrary evidence.

- An October 2018 internal Boeing email contained a one-sentence update stating: "Safran ventures unlikely to close round due to concerns that its investment would be seen as a negative to Boeing." 6-ER-1353. But this email provides no evidence that Boeing did or said anything to Safran. Nothing in the record suggests that a Safran investment would have been "seen as a negative to Boeing," and regardless, Safran's independent perception is irrelevant absent any intentional conduct by Boeing. *Id.*

   b) Improper Means or Improper Purpose

Zunum also needed to establish that Boeing interfered either (i) by "improper means" or (ii) for an "improper purpose": motivated by "an intent to harm" Zunum. *Westmark Development Corp. v. City of Burien*, 140 Wash. App. 540, 556-58 (2007). Zunum failed to do so. *See* 9-ER-2108-110.

*First*, Zunum's primary theory was that Boeing's interference was wrongful because it involved trade-secret misappropriation. 7-ER-1672.

But as already discussed, Zunum failed to present substantial evidence supporting its trade-secret misappropriation allegations. And, separately, nothing in the record shows that Boeing's purported use of the ATS interfered with the Safran investment. In fact, none of the purported evidence of "interference" Zunum cites has anything to do with the ATS.

*Second*, Zunum suggested that Boeing acted improperly by allegedly expressing doubts to Safran about Zunum's technology and leadership, or by not encouraging third parties to invest in Zunum. 9-ER-2035-36; 6-ER-1230-32. Such a theory cannot support Zunum's claim because it is inactionable under both Washington law and the First Amendment. Statements conveying "(a) truthful information, or (b) honest advice within the scope of a request for the advice" are not actionable. *Koch v. Mut. of Enumclaw Ins. Co.*, 108 Wash. App. 500, 506 (2001); Restatement (Second) of Torts § 772 (1979) (no liability for interference "on the part of one who merely gives truthful information to another"). Likewise, under the First Amendment, "opinion . . . statements that do not imply facts capable of being proved true or false" cannot support an interference claim. *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 n.2, 1058 (9th Cir. 1990). Zunum failed to introduce

evidence that any of Boeing's purported communications with Safran were either false or provably false. 6-ER-1230-32; 8-ER-1921.

### c) Proximate Harm

Finally, Zunum failed to establish that Boeing's alleged conduct "proximately caused" Zunum's damages. *Greensun Grp.*, 7 Wash. App. 2d at 775. The evidence presented—combined with Zunum's failure to elicit any evidence from Safran—cannot reasonably support a finding that Boeing's conduct caused the Safran deal to fail. *See Life Designs Ranch, Inc. v. Sommer*, 191 Wash. App. 320, 338 (2015) (affirming summary dismissal of tortious-interference claim for failure to establish causation where "no client, potential client, or referral source submitted an affidavit establishing they . . . did not choose [plaintiff] because of [defendant]"). Instead, the evidence established that Safran chose not to invest due to its own concerns about Zunum. *See* 9-ER-2110-11.

### 3. *The district court properly applied FRCP 50.*

Zunum cites *Reeves* for the proposition that the district court is not permitted to make credibility determinations in ruling on a Rule 50 motion. Yet *Reeves* directs district courts to "give credence . . . [to the] evidence supporting the moving party that is uncontradicted and unimpeached." 530 U.S. at 151. The district court did not make

credibility determinations, but properly reviewed all record evidence, including uncontradicted admissions of Zunum's founders and documents, in determining that Zunum's evidence was insufficient to support its tortious-interference claim.

For example, Zunum argues that testimony by its two cofounders was enough to establish that the Safran investment was reasonably probable. AOB 56-57. To avoid JMOL, "the non-moving party must come forward with more than the mere existence of a scintilla of evidence." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (citation omitted). The nonmoving party must offer "significant probative evidence," not "threadbare conclusory statements." *Lakeside-Scott*, 556 F.3d at 802. Yet threadbare conclusory statements are precisely what Zunum's cofounders offered. For instance, Mr. Knapp speculated that "Safran was, in fact, happy to invest at $89 million." 11-ER-2599. But Zunum offered no evidence (from Safran or otherwise) to corroborate that speculation. Indeed, Zunum's brief omits the very next clause of Mr. Knapp's testimony: "before they [Safran] canceled it." *Id.* That Safran chose not to invest at an $89 million valuation underscores the speculative nature of Mr. Knapp's testimony.

- 61 -

Dr. Kumar's testimony fares no better. In fact, he testified that Zunum had "exchanged terms with Safran," but that the parties still needed "to negotiate" to reach a deal. 15-ER-3422. Those negotiations never occurred, so the investment never closed. *Id.* Zunum's failure to corroborate its founders' testimony with any substantial evidence of an impending deal with Safran (such as term sheets, concrete offers, or any testimonial evidence from Safran showing the likelihood of an investment in Zunum) dooms Zunum's claim. As the district court determined, "the threadbare testimony from Zunum's founders concerning the Safran deal amounts to no more than a speculative inference that a deal with Safran was likely to close, and Zunum therefore fail[ed] to surmount the substantial evidence standard." 1-ER-58.

Zunum makes much of the district court's remark that "Zunum did not have a reasonable expectation of a valid business expectancy with Safran due to its founders' hubris." 1-ER-58. But this was not a credibility assessment. The district court reviewed the record and determined that no evidence supported the cofounders' speculative testimony, and that the cofounders had repeatedly admitted that no business expectancy existed due to their own actions, including: that

- 62 -

they (i) had never agreed to Safran's final terms, (ii) planned to "ramp down" rather than acquiesce to unfavorable terms from Safran, and (iii) saw Safran as an "adversary" making a false offer to invest as a "front" to gain visibility into Zunum's work. 1-ER-57-58. Indeed, as Mr. Knapp conceded, Zunum's failure to raise funds was a crisis "of Zunum's own making." 12-ER-2809, 2816.

D.    <u>Boeing is entitled to JMOL because substantial evidence does not support the jury's damages award.</u>

Even if substantial evidence supported a finding of liability on Zunum's claims, Boeing is still entitled to JMOL because Zunum has no substantial evidence of any damages. Although the district court did not address Boeing's damages arguments, 1-ER-8 n.1, this Court may affirm the judgment for any reason supported by the record. *Surfvivor Media*, 406 F.3d at 630. The record shows that Zunum's only damages "evidence" was improper testimony by its expert Walter Bratic that, even if it were admissible, is insufficient as a matter of law.

1.    *Zunum's only damages evidence—its expert's testimony—was inadmissible.*

Zunum's expert testified to three categories of damages: (1) $163 million for breach of contract and tortious interference;

- 63 -

(2) $110.7 million as the value of the ATS; and (3) $34.5 million as Boeing's avoided development costs.  8-ER-1951.  Despite finding that Mr. Bratic's damages opinions are "extremely shaky," the district court determined that Boeing's challenge was not "appropriate for a Daubert motion, as opposed to a Rule 50 motion."  9-ER-2051, 2054.  Mr. Bratic's trial testimony confirms that Rule 50 relief is appropriate, as all of his opinions are inadmissible.

*First*, the first two categories of damages Zunum's expert testified to were based on a Boeing document called the "Catalyst Deck."  8-ER-1971.  But testimony based on the Catalyst Deck is inadmissible because (i) the Catalyst Deck was never introduced at trial; (ii) it incorporates financial data sourced from Zunum; and (iii) Zunum's expert conducted no independent analysis to verify the accuracy or reliability of Zunum's financial data.  9-ER-2114-16; 16-ER-3780-84 (Mr. Bratic admitting he "didn't do any work to determine whether" certain financial projections he used "were reasonable"); *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015) (holding inadmissible the opinions of a damages expert who "t[akes] as a base assumption the projections [their client] provided," "assumed that they were accurate," does "not delve into the merits of the projected

- 64 -

results," and conducts no "independent assessment of the validity of [the] projected revenues").

*Second*, the second and third damages categories Zunum's expert testified to were based on Zunum's years-later, made-in-litigation estimates of time its employees expended developing the ATS. 8-ER-1981. Zunum's expert did not independently verify his client's allocations, despite relying on them to calculate more than $100 million in damages. 8-ER-1982-83, 1980-81. This is improper and renders the expert's testimony inadmissible, particularly because Zunum's own witnesses admitted that information within the allocations was wrong. 8-ER-1777, 1981-85; *see, e.g.*, *Munoz v. Orr*, 200 F.3d 291, 301-02 (5th Cir. 2000) (affirming exclusion of expert who "relied on the plaintiffs' compilations of data" but "did not seek to verify the information presented to him").

Outside of Mr. Bratic's testimony, Zunum introduced no admissible damages evidence "from which a jury could fairly estimate" damages. *Magnetar*, 801 F.3d at 1159. Boeing is thus entitled to JMOL for this independent reason.

2.    *Even if Zunum's expert's testimony were considered,*

     *substantial evidence does not support damages.*

Putting aside the inadmissibility of Mr. Bratic's testimony, neither

it nor any other record evidence supports Zunum's claimed damages.

**Misappropriation Damages**.  The jury awarded two measures

of damages for Boeing's alleged misappropriation: (i) $67.08 million in

actual damages, and (ii) $14.15 million in unjust enrichment.  Neither

award is supported by substantial evidence, and neither can be

recovered as a matter of law.

<u>Actual Damages</u>.  The jury's award of $67.08 million in actual

damages depends on the fatally flawed theory that Boeing destroyed the

value of Zunum's ATS.  No evidence shows that Boeing's purported

misappropriation of the ATS had any impact on their value, let alone

caused their complete destruction.  Zunum thus failed to prove these

damages and their cause with "reasonable certainty." *Eagle Grp., Inc. v.*

*Pullen*, 114 Wash. App. 409, 420, 418 (2002).  Indeed, Boeing could have

destroyed Zunum's ATS only if Boeing had publicly disclosed them—

and Zunum presented no evidence of any public disclosure.  *See*

Restatement (Third) of Unfair Competition § 45 cmt. d (1995) (plaintiff

may recover "the value of the trade secret if it has been destroyed

through a public disclosure by the defendant"); *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 969 (2d Cir. 1997) (damages based on destruction of value unavailable when defendant "did not publish [the alleged] secrets, and therefore did not destroy their value").

At any rate, no evidence demonstrates that Zunum's ATS were ever worth $67.08 million. Zunum's own witnesses and documents show that their value was less than $5 million. 8-ER-1774 (Mr. Knapp admitting the value of both the "Zunum team" and Zunum's "intellectual property was probably under $5 million"); *see* 8-ER-1991 (Zunum's 409A valuing the entire company at $3 million as of October 2018).

Unjust Enrichment Damages. The jury's award of $14.15 million in unjust enrichment damages is also unsupported by substantial evidence. To begin, despite alleging that Boeing used the ATS mainly in 2017, Zunum based its unjust enrichment damages on development costs Zunum incurred in 2018, *after* Boeing's alleged use. 8-ER-1995. In other words, Zunum's theory was that Boeing avoided costs that *no one*

had incurred at the time—not even Zunum—by using ATS that were not even complete.[6]

That disconnect undermines any evidentiary basis for damages. What's more, Zunum claimed damages for *all* its supposed costs to develop the entirety of each ATS, without tailoring its damages calculations to the specific information Boeing allegedly used. *See, e.g.*, 8-ER-1965.

Regardless, Zunum presented no evidence that it spent $14.15 million to develop the ATS. Indeed, Zunum never had that much to spend in the first place. 8-ER-1739 (Zunum raised only "roughly $13 million"); *see also* 8-ER-1957 (Zunum expert conceding that "the spending on each of the individual [nineteen] trade secrets . . . adds up to $12.6 million at the bottom").

**Breach of the IRL Damages**. The jury's award of $67.08 million for the IRL breach claim is equally improper as a matter of law.

*First*, nothing in the record shows that Boeing's alleged IRL breach had any impact on Zunum, let alone caused $67.08 million in

---

[6] During Boeing's alleged misappropriation in 2017, Zunum had incurred between only 8% and 23% of its total claimed costs to develop the ATS. 16-ER-3815-16.

damages. Indeed, no evidence shows that Zunum suffered any harm at all from Boeing's alleged breach of the IRL. *Supra* § I.B.3. Even Mr. Bratic could not link any purported breach of the IRL to the alleged lost value. 8-ER-1963-64 (Mr. Bratic admitting his damages calculations are "not dependent on whether Boeing breached one contract, two contracts, five contracts, or any other number of contracts" or on "the manner in which the [alleged] breach occurred").

*Second*, Zunum provided no basis to find that anyone ever valued Zunum at $67.08 million. Although Mr. Bratic opined that Zunum was worth $163 million, that opinion was improper because it was based solely on the unverified Catalyst Deck (which was not in evidence and, in any event, indicated that Zunum's value was at most $25-50 million). 8-ER-1960.

*Third*, as discussed above, Zunum presented no evidence or analysis that its ATS ceased to have any value. There is thus no basis to conclude that Zunum's value was destroyed.

**Tortious-Interference Damages**. The evidence cannot reasonably support the jury's tortious-interference award of $11.56 million. At trial, Mr. Bratic assumed that Boeing's alleged tortious interference destroyed Zunum's value (for damages of

- 69 -

$163 million). 8-ER-1966. Yet the jury formulated its own damages award, disconnected from these theories of lost value and unsupported by any evidence.

*First*, if the jury's award is intended to represent some measure of Zunum's lost value, it is improper because no evidence establishes that Zunum's company value decreased by $11.56 million due to Boeing's alleged interference with the potential Safran investment. Any such determination would amount to "mere speculation or conjecture." *Leibsohn Prop. Advisors Inc. v. Colliers Int'l Realty Advisors (USA), Inc.*, 177 Wash. App. 1021, 22 (2013). As Mr. Bratic admitted, there was no evidence to suggest Safran considered investing anything more than $5 million, with only $2-3 million upfront and the rest contingent upon unidentified conditions. 8-ER-1967.

*Second*, any award of damages for lost company value would be duplicative of Zunum's contract and misappropriation damages, which Zunum expressly recognized. 9-ER-2043; *see also* 8-ER-1951-52.

## II. In the alternative, the district court did not abuse its discretion in granting Boeing's motion for a new trial.

### A. The district court retained jurisdiction to rule on the new-trial motion after Zunum appealed.

After the district court issued its Rule 50 ruling, Boeing requested that the district court also "issue a conditional ruling on Boeing's motion for a new trial and amend its Judgment reflecting that ruling" "[t]o avoid piecemeal appeals and conserve litigation resources." 2-ER-67. The district court retained jurisdiction to rule on Boeing's requests "to alter or amend the judgment under Rule 59" and to rule on a "motion for a new trial." Fed. R. App. P. 4(a)(4)(A)(iv)-(v), 4(a)(4)(B)(i). Zunum could not block Boeing from making such a request, or nullify the district court's jurisdiction to rule on it, by filing its notice of appeal early. *See id.*; *see also Schroeder v. McDonald*, 55 F.3d 454, 458 (9th Cir. 1995) ("[W]hen a notice [of appeal] is prematurely filed, it shall be in abeyance and become effective upon the date of entry of an order disposing of the Rule 59(e) motion [to alter or amend judgment]."). Zunum is therefore wrong that the district court must be treated as if it did not render any conditional ruling.

B.  The district court did not abuse its discretion in conditionally granting Boeing's motion for a new trial.

The district court did not abuse its discretion in conditionally granting a new trial.  9-ER-2097-98, 2103-04, 2111-13, 2125-26.  That would be so even if JMOL (which is reviewed *de novo*) were unwarranted.  *Dees*, 960 F.3d at 1155.

**Trade-Secret Misappropriation**.  *First*, the jury's finding that Boeing misappropriated the ATS is not "supported by the clear weight of the evidence" for all the reasons discussed above, so "the district court's decision to grant a new trial must stand."  *Dees*, 960 F.3d at 1155.

*Second*, Zunum's failure to identify the ATS with sufficient particularity both improperly left the jury to its own devices and prejudiced Boeing's ability to present its defense.  *See InteliClear*, 978 F.3d at 658.

*Third*, because Zunum's contract claim based on the PIA was co-extensive with its misappropriation claim, the jury's finding that Boeing did not breach the PIA establishes that Boeing did not misappropriate trade-secret information disclosed under the PIA.  9-ER-2049.  Since the ATS Boeing was accused of misappropriating were allegedly disclosed

under the PIA, 7-ER-1693, the jury's finding of misappropriation requires a new trial.

**Breach of the IRL**.  *First*, any finding that Boeing misused confidential information in breach of the IRL is not "supported by the clear weight of the evidence" for the same reasons JMOL was warranted.  *Dees*, 960 F.3d at 1155.

*Second*, the jury's finding that Boeing's use of Zunum's information constituted a breach of the IRL is unsupported given its finding that Boeing did not breach the PIA.[7]  The two slides disclosed under the IRL pertain to ATS 11 and 19 but do not comprise the entirety of those "secrets." *Supra* § I.B.1.  Zunum never proved that ATS 11 and 19 were entirely governed by the IRL, and the only evidence in the record shows that they were primarily disclosed under the PIA.  7-ER-1693 ("most of" the ATS were disclosed in January 2017).  Because the jury found that Boeing did not breach the PIA—and

---

[7] Zunum argues that Boeing "waived" any verdict inconsistency arguments.  AOB 63.  Boeing's argument is not that the verdict is "internally inconsistent," but that it is inconsistent with the evidence. *Kode v. Carlson*, 596 F.3d 608, 611 (9th Cir. 2010).  The waiver rule on which Zunum relies applies only to the former, not to new trial requests based on the "[in]adequacy of factual findings to support a judgment." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1033 (9th Cir. 2003).

thus could not have misused ATS 11 and 19—its apparent finding that Boeing breached the IRL by misusing information in the two slides is (at best) "inconsistent" with the evidence "or confused," warranting a new trial. *E.F. Hutton & Co. v. Arnebergh*, 775 F.2d 1061, 1064 (9th Cir. 1985).

**Tortious Interference**. *First*, the jury's finding of Boeing's alleged interference is "against the weight of the evidence" for the same reasons JMOL was warranted. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007).

*Second*, a new trial is warranted because the jury considered statements constituting protected speech under the First Amendment and Washington law in finding tortious interference.[8] *See supra* § I.C.2.b. Because the jury was not instructed to disregard this protected speech, Boeing suffered undue prejudice requiring a new trial. *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) ("failure to give adequate instructions" is a "bas[i]s for a new trial."); 9-ER-2111.

---

[8] Although the district court did not rely on this ground when granting Boeing's motion for a new trial, this argument presents a pure question of law, and this Court may affirm for any reason supported by the record. *See Surfvivor Media*, 406 F.3d at 630

- 74 -

**Damages**.  *First*, as discussed above, the jury's damages awards are against the weight of the evidence and based on inadmissible testimony from Mr. Bratic.  *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 81 (Fed. Cir. 2012) ("Because the jury's verdict was based on an expert opinion that finds no support in the facts in the record," "[a] new trial is required[.]").

*Second*, if this Court affirms JMOL on (i) some but not all ATS, or (ii) some but not all confidential information items subject to Zunum's IRL breach claim, a new trial on damages is required.  That is because the jury's lump-sum awards (and finding in favor of Boeing's failure-to-mitigate defense) do not allocate damages among particular ATS or confidential information.  *See Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 160 (2d Cir. 2012) ("When it is not possible to ascertain what portions of the . . . damages awards were attributable to [dismissed] claims . . . the damages awards must be vacated and remanded for a new trial on damages." (cleaned up)).

## III.  If remand is necessary, reassignment is unwarranted.

By failing to ask Judge Robart to recuse, Zunum waived any right to argue recusal on appeal.  *See Liljeberg v. Health Servs.  Acquisition Corp.*, 486 U.S. 847, 868 (1988) (stating that remedies for violations of

the recusal statute depend on making "a timely request for relief"); *see also Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1108-09 (9th Cir. 2001) ("Generally, an appellate court will not hear an issue raised for the first time on appeal."). Its recusal-by-indirection argument, seeking reassignment of the case on remand, is barred for the same reason.

The district court did nothing wrong. "[D]isqualification is not required if the . . . judge . . . divests . . . the interest that provides the grounds for the disqualification." 28 U.S.C. § 455(f). Boeing's stock was purchased blindly by an IRA, and the district court directed the sale of the stock within a day of learning of the transaction. 2-ER-61-63. When stock was again purchased blindly by an IRA, the district court directed the sale of the stock within 10 days. *Id.* Between January 27, 2023 and July 31, 2023—when these trades occurred—Judge Robart took no actions in this case and nothing significant occurred. *Id.* Zunum cites no authority that reassignment is warranted.

## <u>CONCLUSION</u>

For all these reasons, the district court's decision should be affirmed.


Dated: February 24, 2025      **HUESTON HENNIGAN LLP**

By: <u>*/s/ Yegor Fursevich*</u>
John C. Hueston
Moez M. Kaba
Yegor Fursevich

*Attorneys for Defendants-Appellees*
*The Boeing Company and Boeing*
*HorizonX Ventures, LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-5212 (L), 24-5751

I am the attorney or self-represented party.

**This brief contains** 13,994 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Yegor Fursevich **Date** 02/24/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*